[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 13, 2011
JOHN LEY
CLERK

————————————

No. 10-13490

————————————

D.C. Docket No. 1:08-cv-21804-DLG

JESUS DELGADO,

Petitioner - Appellant,

versus

FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————

(October 13, 2011)

Before BARKETT, WILSON and MARTIN, Circuit Judges.

WILSON, Circuit Judge:

In 1994, Jesus Delgado was convicted of two counts of first-degree murder, one count of armed burglary, and one count of possession of a firearm by a convicted felon, but those convictions were set aside on appeal by the Florida Supreme Court. In 2004, Delgado was retried and again convicted of two counts of first-degree murder. He claims that this second trial violated the Fifth

Amendment's prohibition on double jeopardy. On direct appeal, the Florida Supreme Court denied him relief, as did the federal district court on his application for a writ of habeas corpus. Having carefully reviewed the Florida Supreme Court's decision in light of United States Supreme Court precedent, we conclude that Delgado is not entitled to habeas relief because he was not "twice put in jeopardy" as that phrase is defined in federal constitutional law.

I.

In order to properly frame the parties' arguments, we offer the following background.

A.

On direct appeal from Delgado's first trial, the Florida Supreme Court summarized the underlying crime as follows:

> Marlene McField was a neighbor of Tomas and Violetta Rodriguez, the victims in this case. In the early evening hours of August 30, 1990, Ms. McField witnessed the Rodriguezes arrive home. Later, at around 10 p.m., Ms. McField remembered hearing dogs in the home directly behind the Rodriguezes' home wailing in an unusual fashion.
>
> The following morning, Ms. McField went to the Rodriguezes' home and noticed that the gate leading to the Rodriguezes' front porch was ajar; the key was still in the lock on the inside portion of the gate. Ms. McField removed the key from the gate and entered the front porch area. She then rang the doorbell, but no one answered. Knowing that the Rodriguezes were extremely security-conscious people, Ms. McField became suspicious and summoned the police.
>
> When the police arrived, they discovered that the front door was unlocked. The first officer on the scene did not

2

notice any sign of a forced entry. Inside, police secured the bedrooms and living room area first. Nothing in those areas indicated anything unusual. As the police moved toward the kitchen, they noticed a bloodstained knife and a pistol lying on the floor.

The kitchen, utility room, and garage did exhibit signs of a possible struggle. The utility room connects the kitchen and the garage. A wooden door leading from the utility room into the garage was cracked in the center and its hinges were broken. Mr. Rodriguez's body was discovered next to this door, just inside the garage. His body had bullet and stab wounds. Ms. Rodriguez's body was also discovered in the garage; it was wedged between a car and the garage wall. Her body had blunt force trauma and stab wounds.

In the kitchen, two cabinet drawers were open. The knife which police found was similar to a set found in one of the open kitchen drawers. A single set of bloody shoe-print impressions led from the garage into the kitchen and up to these drawers. Mr. Rodriguez was found without shoes and the soles of Ms. Rodriguez's slippers did not match the bloody impressions.

The pistol found next to the knife, a .22 caliber Ruger semiautomatic, was equipped with a silencer. Police could not trace the pistol because its serial number had been removed. Police did recover six .22 caliber shell casings that were later determined to have been fired from the Ruger. No other .22 caliber ammunition was found at the home. Police also found a .38 caliber revolver, which belonged to Mr. Rodriguez, in a zippered pouch inside a closed cabinet in the master bedroom. Testing on the revolver revealed it had not been fired. The State presented an expert who testified that tests performed on the victims' hands indicated that neither had triggered a firearm.

3

A single drop of only appellant's blood[1] was found in the garage. A mixture of appellant's and the victims' blood was found in the garage, on the handgun, at the base of the kitchen phone that hung from a wall, and on the kitchen phone itself. Appellant's palm print was discovered on the kitchen phone. The police determined that the last call on this phone was made to Barbara Lamellas' home, where appellant resided at the time.

In addition to the physical evidence gathered from the scene, police learned that appellant and the Rodriguezes knew each other and had recently experienced difficulties as a result of a business transaction between the Rodriguezes and Horatio Lamellas. In June of 1990, the Rodriguezes sold their dry cleaning business to Horatio Lamellas. After the purchase, Barbara Lamellas, Horatio Lamellas' daughter, and appellant, Ms. Lamellas' boyfriend, ran the business.

Maria Hernandez worked at the dry cleaning business before and after the sale to Mr. Lamellas. Ms. Hernandez testified that after the sale she observed appellant complaining that the machines were not working properly and about dissatisfied customers. According to Ms. Hernandez, appellant stated that the Rodriguezes had "tricked him with the machines, and the business they had sold them." Ms. Hernandez stated that while the Rodriguezes were in charge, business was steady and the machines worked well.

Based on this information regarding the dry cleaning business and the evidence found at the home, appellant became a suspect. Appellant was not located and apprehended by police until December 23, 1992, more than two years after the murders.

Delgado v. State, 776 So. 2d 233, 234–35 (Fla. 2000) (per curiam) ("Delgado I"), superseded by statute, Fla. Stat. § 810.015.

---

[1] As clarified in Delgado's second direct appeal, Delgado v. State, 948 So. 2d 681, 683 (Fla. 2006) (per curiam) ("Delgado II"), the blood was determined to match Delgado's blood type—a type shared by only one percent of the population.

B.

A grand jury indicted Delgado for two counts of first-degree murder, one count of armed burglary, and one count of possession of a firearm by a convicted felon. Delgado v. State, 948 So. 2d 681, 684 (Fla. 2006) (per curiam) ("Delgado II"). The indictment charged first-degree murder on the alternative theories of premeditation and felony murder. Id. The predicate offense supporting Delgado's felony-murder charge was burglary.[2] Delgado I, 776 So. 2d at 236.

In Florida, burglary entails "entering or remaining in a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain." Fla. Stat. § 810.02(1)(a). Unlike its common law counterpart, Florida's statutory definition of burglary does not require an illegal breaking and entering of a protected premises with the intent to commit a felony. See Delgado I, 776 So. 2d at 236. Instead, it is sufficient that a burglar simply "remain in" a structure

---

[2] Count One, which related to the killing of Tomas Rodriguez, read:

> The Grand Jurors of the State of Florida, duly called, impaneled and sworn to inquire and true presentment make in and for the body of the County of Dade, upon their oaths, present that on or between the 29th day of August, 1990 and the 31st day of August, 1990, within the County of Dade, State of Florida, JESUS DELGADO, did unlawfully and feloniously kill a human being, to wit: TOMAS RODRIGUEZ, from a premeditated design to effect the death of TOMAS RODRIGUEZ, or while engaged in the perpetration of, or in an attempt to perpetrate burglary, by shooting TOMAS RODRIGUEZ with a firearm, in violation of Section 782.04(1), Florida Statutes, to the evil example of all others in like cases offending and against the peace and dignity of the State of Florida.

Count Two, which related to the killing of Violetta Rodriguez, was identical, excepting the substitution of Violetta Rodriguez's name for that of her husband.

5

with "the intent to commit an offense therein." Fla. Stat. § 810.02(1). The crime, nevertheless, retains its trespassory foundations, meaning that consent to enter and remain in the relevant structure is a complete defense. See State v. Hicks, 421 So. 2d 510, 510–11 (Fla. 1982); Ray v. State, 522 So. 2d 963, 964 n.3 (Fla. 3d Dist. Ct. App. 1988), overruled on other grounds by Delgado I, 776 So. 2d at 240–41, superseded by statute, Fla. Stat. § 810.015 (reinstating Ray).

Before Delgado's first direct appeal, Florida courts interpreted the burglary statute's "remaining in" language broadly. See, e.g., Ray, 522 So. 2d at 965–67. Because "a person would not ordinarily tolerate another person remaining in the premises and committing a crime, and that when a victim becomes aware of the commission of a crime, the victim implicitly withdraws consent to the perpetrator's remaining in the premises," id. at 966, courts readily allowed circumstantial evidence to demonstrate that a defendant's license to remain in the victim's premises had been withdrawn at the time the defendant began committing the predicate criminal offense. See, e.g., id. at 966 ("[W]e will not require that [the victim] have yelled to the defendant, 'Get out!' before we can conclude that the defendant's license to remain on the premises was withdrawn."). As noted by the Florida Supreme Court in Delgado I, this liberal interpretation of the "remaining in" clause effectively converted a host of criminal offenses into burglaries, simply because they were committed indoors:

> [I]f we make the assumption that "a person would not ordinarily tolerate another person remaining in the premises and committing a crime," and assuming that this withdrawn consent can be established at trial, a number of

6

crimes that would normally not qualify as felonies would suddenly be elevated to burglary. In other words, any crime, including misdemeanors, committed on another person's premises would become a burglary if the owner of the premises becomes aware that the suspect is committing the crime. Obviously, this leads to an absurd result. For example, if a person hosts a party and catches an invitee smoking marijuana on the premises, the invitee is not only guilty of a misdemeanor marijuana charge but also of burglary, a second-degree felony. The same can be said of the invitee who writes a bad check for pizza in front of an aware host. The other extreme is also true. An invitee who commits second-degree murder on another person's premises and in the presence of an aware host could be charged with first-degree felony murder, with the underlying felony being burglary. The possibility exists that many homicides could be elevated to first-degree murder, merely because the killing was committed indoors.

Delgado I, 776 So.2d at 239.

Delgado's burglary and felony murder charges were brought on just such a theory. See id. at 236. "The State prosecuted this case on the premise that appellant's entry into the victims' home was consensual (i.e., appellant was invited to enter the victims' home) but that at some point, this consent was withdrawn." Id. Relying on Delgado's specific intent to kill the victims, the indictment designated "murder" as the predicate offense supporting burglary:

> The Grand Jurors of the State of Florida, duly called, impaneled and sworn to inquire and true presentment make in and for the body of the County of Dade, upon their oaths, present that on or between the 29th day of August, 1990 and the 31st day of August, 1990, within the County of Dade, State of Florida, JESUS DELGADO, did enter or remain in a dwelling, the property of TOMAS RODRIGUEZ and/or VIOLETTA RODRIGUEZ, without the consent of TOMAS RODRIGUEZ and/or VIOLETTA RODRIGUEZ, as owners or custodians, located at 11200 Southwest 157th Street, Miami, Dade County, Florida, the

7

same being occupied by TOMAS RODRIGUEZ and/or VIOLETTA RODRIGUEZ. JESUS DELGADO <u>having an intent to commit an offense therein, to wit: Murder</u>, and in the course of committing said burglary JESUS DELGADO was armed with or did arm himself with a firearm, in violation of 810.02 Florida Statutes, to the evil example of all others in like cases offending and against the peace and dignity of the State of Florida.

(emphasis added).

The upshot of this legal backdrop was that, by simply causing the victims' death indoors with the specific intent to do so, Delgado committed both premeditated murder and felony murder in the commission of a burglary. Both theories relied on proof of the same facts. And, as reflected by the jury instructions, both crimes required the jury to find all the elements of premeditated murder.

## C.

At the end of trial, the court charged the jury in the following manner:

1. Premeditated Murder

> Now, there are two ways in which a person maybe [sic] convicted of first degree murder. One is known as premeditated murder, and the other one is known as felony murder.
>
> Before you can find the defendant guilty of first degree murder premeditated murder [sic], the State must prove the following three elements beyond a reasonable doubt; that Violetta Rodriguez and Tomas Rodriguez are dead. That the death was caused by the criminal act or agency of Jesus Delgado, and that there was a premeditated killing of Violetta Rodriguez and Tomas Rodriguez.
>
> Now, killing with premeditation is killing after consciously deciding to do so. The decision must be

8

present in the mind at the time of the killing. The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill, and the killing. The period of time must be long enough to allowed [sic] reflection by the defendant. The premeditated intent to kill must be formed before the killing.

## 2. Felony Murder

Now, before you can find the defendant guilty of first degree felony murder the State must prove the following three elements beyond a reasonable doubt.

Violetta Rodriguez and Tomas Rodriguez are dead. And the death occurred as a consequence of and while Jesus Delgado was in [sic] engaged in the commission of a burglary. The death occurred as a consequence of and while Jesus Delgado was attempting to commit the burglary, and Jesus Delgado was the person who actually killed Violetta Rodriquez [sic] and/or Tomas Rodriquez [sic].

In order to convict of first degree felony murder <u>it is not necessary for the State to prove that the defendant had a premeditate design or intent to kill</u>.[3]

## 3. Burglary

Now, before you can find the defendant guilty of armed burglary count 3, the State must prove the following three elements beyond a reasonable doubt. That Mr. Delgado entered or remained in a structure owned by or was in the possession of a Violetta Rodriquez [sic] and Tomas Rodriquez [sic]. That Mr. Delgado did not have permission or consent of Violetta and/or Tomas Rodriguez, or anyone authorize [sic] to act for them, to enter in their the [sic] structure at that time.

---

[3] Though this admonition is true in a traditional felony-murder context, since the predicate offense in this case, burglary, itself required specific intent to kill the victims, see supra note 4, this instruction was incorrect.

> At the time of entering or remaining in the structure the defendant had a fully-form [sic], and conscious intent to commit the offense of murder in that structure.[4]
>
> A person may be guilty of this offense if he originally entered the premises with the consent [sic], but remain [sic] thereafter. He knew the consent had been withdrawn, and consent maybe [sic] withdrawn by words or actions.
>
> The intent in which [sic] the act is done isn't [sic] is an operation of the mind, and therefore, is not always capable of direct and positive proof.
>
> It may be established by circumstantial evidence like any other fact in the case. Even though an unlawful entering or remaining in a structure proved [sic] if the evidence does not establish it was done with the intent to commit murder. The defendant must be found not guilty.

Trial Transcript at 1504–13 (all emphases added).

After being so charged, the jury found Delgado guilty on all counts, including the two counts of first-degree murder. Because the verdict was general, the jury did not specify the theory of first-degree murder upon which it relied.[5] At the penalty phase of trial, the court followed the jury's recommendation and sentenced Delgado to death.

D.

---

[4] This instruction, like the subsequently emphasized one, contradicts the standard felony murder state-of-mind instruction highlighted above: "In order to convict of first degree felony murder it is not necessary for the State to prove that the defendant had a premeditate design or intent to kill." See note 3, infra.

[5] The court did not enter judgment on the firearm count, as it merged with the armed burglary.

10

On direct appeal, Delgado challenged, among other things, the legal and factual sufficiency of the State's felony-murder charge. The Florida Supreme Court re-examined the meaning of the burglary statute and concluded that a "remaining in" had to be "surreptitious" in order to satisfy the elements of burglary. See Delgado I, 776 So. 2d at 240. It began by examining the common law origins of the crime, tracing burglary's evolution from its narrow common law foundations through its statutory expansion in modern times. Id. at 236–37. It looked to the Model Penal Code, legal scholarship, and New York caselaw interpreting a similarly worded statute to inform its interpretation of that expansion's proper scope. Id. at 236–38. The court hypothesized about the absurd results that would flow from extending Ray to its logical conclusion. Id. at 239. And finally, it concluded that principles of statutory construction required a reinterpretation of the "remaining in" clause, because—absent the addition of a "surreptitiousness" requirement to the statutory language—current case law "effectively wiped out the clause 'unless . . . the defendant is licensed or invited to enter'" from the statutory text. Id. at 240.

Additionally, the court determined the statute was ambiguous, and the principle of lenity required it to resolve that ambiguity in favor of the accused:

> Applying this principle to the present case, the most favorable interpretation of Florida's burglary statute is to hold that the "remaining in" language applies only in situations where the remaining in was done surreptitiously. This interpretation is consistent with the original intention of the burglary statute. In the context of an occupied dwelling, burglary was not intended to cover the situation where an invited guest turns criminal or violent. Rather,

11

> burglary was intended to criminalize the conduct of a suspect who terrorizes, shocks, or surprises the unknowing occupant. Many other states that have the "remaining in" language in their burglary statutes have included the word surreptitiously or similar language in the statute.
>
> As stated earlier, consensual entry is an affirmative defense to the charge of burglary, and therefore the burden is on the defendant to establish that there was consent to enter. . . . In the present case, there exists sufficient evidence in the record that appellant met his burden of establishing consensual entry. We are cognizant that after appellant entered the victims' home, he is accused of committing two heinous murders. Regardless of whether these accusations are true, appellant's actions are not the type of conduct which the crime of burglary was intended to punish. Our decision in no way prevents the State from prosecuting appellant for whatever crimes he may have committed once inside the victims' home. But considering both the record in this case and the State's theory of the crime, appellant's conduct does not amount to burglary.

Id. at 240–41 (footnotes omitted) (citations omitted).

At the end of its opinion, the court framed its decision to remand the case for retrial by referencing Yates v. United States, 354 U.S. 298, 77 S. Ct. 1064 (1957) (remanding a case for retrial after holding that a general jury verdict cannot be upheld when the jury was instructed on alternative theories of guilt and one of those theories was legally insufficient), overruled in part by Burks v. United States, 437 U.S. 1, 16, 98 S. Ct. 2141 (1978). In addition, it explicitly distinguished Delgado's case from the parallel scenario where, under Griffin v. United States, 502 U.S. 46, 112 S. Ct. 466 (1991), a general verdict may be upheld where a jury was instructed on alternative theories of guilt and one of those theories is factually insufficient:

12

This is not a case where there was merely insufficient evidence to support the burglary charge. The jury in this case was instructed that a defendant can be found guilty of burglary, even if the initial entry was consensual, if the victims later withdrew their consent. This theory of burglary was also relied on by the State as the underlying felony to support the felony murder charge. Pursuant to our analysis in today's opinion, such a theory of burglary (and felony murder) is legally inadequate.

Delgado I, 776 So. 2d at 242.

E.

Before his second trial, Delgado unsuccessfully challenged his subsequent prosecution as a violation of double jeopardy. After he was again convicted of premeditated murder and sentenced to death, Delgado appealed, arguing the double jeopardy issue. The Florida Supreme Court rejected his claim as follows:

**I. Double Jeopardy**

Delgado claims that his retrial on two counts of first-degree premeditated murder was barred by double jeopardy because he was, in effect, judicially acquitted of first-degree murder by this Court in Delgado I. Delgado reasons that because this Court held that the State's theory of burglary was both factually and legally insufficient, likewise the State's theory of first-degree felony murder was both factually and legally insufficient. He further reasons that he has effectually been acquitted of first-degree murder in its entirety due to the factual insufficiency of the underlying theory of felony murder and, therefore, cannot be retried on the theory of premeditated murder.

Delgado's claim is without merit. While we recognize that an acquittal is required when a conviction is not supported by factually sufficient evidence, see, e.g., Ballard v. State, 923 So. 2d 475, 486 (Fla. 2006) (reversing convictions, vacating sentences, and remanding with directions to enter a judgment of acquittal where evidence

13

was insufficient to support convictions), and that such an acquittal gives rise to double jeopardy protections, Sattazahn v. Pennsylvania, 537 U.S. 101, 123 S. Ct. 732, 154 L.Ed.2d 588 (2003), this Court did not effectually acquit Delgado of first-degree murder in Delgado I. In Delgado I, we discussed at length the distinction between legal and factual insufficiency and expressly stated that "[t]his is not a case where there was merely insufficient evidence to support the burglary charge." Id. at 242 (emphasis added). Rather, we stated that "[p]ursuant to our analysis in today's opinion, [the State's] theory of burglary (and felony murder) is legally inadequate." Id. (emphasis added). We did not find that either of the State's theories of first-degree murder was factually insufficient and expressly stated that "[o]ur decision in no way prevents the State from prosecuting appellant for whatever crimes he may have committed once inside the victim's home." Id. at 241. In fact, the only factual insufficiency we recognized was consequent to our holding that the State was required to show that Delgado remained in the Rodriguezes' dwelling surreptitiously in order to prove Delgado committed burglary. Id. at 242.

Moreover, even if the State's theory of felony murder was rendered factually insufficient by our holding in Delgado I, we expressly recognized that a defendant may be retried on the same count where one of two alternative theories is factually insufficient but the other is not. Id. (citing Griffin v. United States, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991); San Martin v. State, 717 So.2d 462, 470 (Fla.1998)). Thus, because the State's alternative theory of first-degree murder based on premeditation was not held to be factually insufficient in Delgado I, Delgado was not effectually acquitted of first-degree murder.

In the alternative, Delgado asserts that he was acquitted of premeditated murder under Delgado I because the State's theory of burglary at his first trial included all the elements of premeditated murder; and, therefore, his acquittal on the burglary count amounts to an acquittal on the premeditated murder count under the "same elements" test of Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).[7] However, burglary and

14

first-degree premeditated murder do not share all of the same statutory elements; in particular, they do not share the same element of intent.[8]  Conceding this fact, Delgado invites us to expand the "same elements" test beyond a comparison of the statutory elements to consider the record and the State's actual theory.  Gaber v. State, 684 So. 2d 189, 190 (Fla.1996) (stating that in our double jeopardy analysis, "we cannot examine facts from the record" but "must look only to the statutory elements").  We decline the invitation.  We find no compelling reason to depart from established precedent and expand the "same elements" test in Florida.

> 7. "This test inquires whether each offense contains an element not contained in the other; if not, they are the same offense and double jeopardy bars subsequent punishment or prosecution."  Boler v. State, 678 So. 2d 319, 321 (Fla. 1996) (citing Blockburger, 284 U.S. at 304, 52 S. Ct. 180).

> 8. The intent required for burglary is that the accused intended to commit an offense. § 810.02(1)(a), Fla. Stat. (2006).  The intent required for premeditated murder is that the accused formed the specific intent to kill a human being. § 782.04(1)(a)(1), Fla. Stat. (2006).

Our holding in Delgado I did not bar the State from retrying Delgado for first-degree murder under the theory that it was premeditated.  Therefore, we deny this claim for relief.

Delgado v. State, 948 So. 2d 681, 686–87 (Fla. 2006) (per curiam) ("Delgado II").

Delgado waived state post-conviction proceedings and applied for habeas relief in federal district court on his Fifth Amendment claim.  The district court denied his application, and Delgado appeals that decision here.

II.

15

We note at the outset that this constitutional claim comes to us following a prior merits adjudication in state court, and Delgado does not challenge the factual underpinnings of that prior state court decision.  Consequently, Delgado is not entitled to relief in federal court unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

\* \* \*

In his federal petition, as he did in his state court appeal, Delgado argues that his retrial for premeditated murder violated his rights under the Fifth Amendment's Double Jeopardy Clause, because he had already been put once in jeopardy for the "same offense."  The substance of his argument is best understood as consisting of three analytical steps.

First, in Delgado I, the Florida Supreme Court found the prosecution's trial evidence was insufficient to sustain its charge of felony murder on the basis of burglary and, consequently, judicially acquitted Delgado of felony murder and burglary.  See United States v. Martin Linen Supply Co., 430 U.S. 564, 571, 97 S. Ct. 1349 (1977) (defining a judicial "acquittal" as a ruling by the court in favor of the defendant that, "whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged").  Just like a favorable jury verdict, such an acquittal triggers the full protections of the Double

16

Jeopardy Clause and bars any subsequent jeopardy for the "same offense." See Burks, 437 U.S. at 15.

Second, under Florida's peculiar burglary law, Delgado's premeditated murder charge was a lesser-included offense of his felony-murder charge. Because the felony murder was predicated upon burglary, and that burglary was itself predicated upon the crime of premeditated murder—requiring, in the words of the court in its jury instructions, that Delgado "had a fully-form [sic], and conscious intent to commit the offense of murder in that structure," Trial Transcript at 1513—the charge of premeditated murder in his second trial did not "require[] proof of a fact which the [felony murder did] not." See Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180 (1932) ("The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."); Brown v. Ohio, 432 U.S. 161, 166, 97 S. Ct. 2221 (1977); Ex parte Nielsen, 131 U.S. 176, 188–89, 9 S. Ct. 672 (1889) ("[I]t seems to us very clear that where, as in this case, a person has been tried and convicted for a crime which has various incidents included in it, he cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offense.").

And, third, because the Constitution's bar on successive prosecutions for the "same offense" necessarily bars prosecutions for lesser- (and greater-) included offenses, see Brown, 432 U.S. at 168 (defining a lesser-included offense as an

17

offense "requir[ing] no proof beyond that which is required for conviction of the greater"), the State was prohibited from retrying him for premeditated murder in a second trial.[6]

Delgado further argues that the Florida Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" because the court refused to look beyond the statutory elements of felony murder and premeditated murder to the description of those elements presented to the jury at trial. He grounds this argument in Ex parte Nielsen, 131 U.S. at 188–89, and its progeny, which he interprets as requiring more than an abstract statutory comparison of elements in a successive prosecution case like his. He also cites our own decision in Mars v. Mounts, 895 F.2d 1348 (11th Cir. 1990), as well as various opinions from our sister circuits, as supporting this view.

After careful consideration, we conclude that Delgado's double-jeopardy claim is without merit. Even if we assume, for the purposes of this case, that the State's premeditated murder charge in Delgado's second trial was for the "same offense" as the felony-murder charge in his initial prosecution, Delgado's Fifth Amendment rights were not violated because there was no second "jeopardy," as that concept is defined under federal constitutional law. Consequently, the state

---

[6] Delgado focuses a great deal of energy on trying to distinguish his case from some others because Florida's first-degree murder statute criminalizes premeditated murder and felony murder in the same statutory provision, as opposed to two separate ones. We have previously rejected that this statute's organization has any constitutional significance for the purposes of successive-prosecution double-jeopardy analysis. See Delap v. Dugger, 890 F.2d 285, 313 n.36 (11th Cir. 1989); see also State v. Wright, 203 P.3d 1027, 1032 n.6 (Wash. 2009) (en banc). However, Delgado's failure to establish the constitutional significance of this distinction does not compromise the substance of his argument.

18

court's prior denial of post-conviction relief was not only not "contrary to" or "an

unreasonable application of" Supreme Court precedent, § 2254(d)(1), it was

entirely correct.[7]  We therefore affirm the judgment of the district

---

[7] Our conclusion here is limited to the Florida Supreme Court's primary ruling that Delgado was not acquitted, not its alternative determination that Delgado was not tried twice for the same offense.  Latching on to this alternative ruling, the State urges us to deny Delgado's petition on "same offense" grounds, arguing that, under Blockburger, we may not look beyond the abstract statutory elements of two relevant offenses—even to indictment—to evaluate their "sameness" and accusing Delgado of trying to resurrect Grady v. Corbin's "same conduct" test. 495 U.S. 508, 510, 110 S. Ct. 2084 (1990), overruled by United States v. Dixon, 509 U.S. 688, 704, 113 S. Ct. 2849 (1993).

The State's stance on what constitutes the "same offense" for double-jeopardy purposes drastically oversimplifies what is an exceedingly complex area of constitutional law, see Whalen v. United States, 445 U.S. 684, 700, 100 S. Ct. 1432 (1980) (Rehnquist, J., dissenting) (characterizing "the words 'same offense'" as "deceptively simple in appearance but virtually kaleidoscopic in application"), and it calls to mind our introductory remarks in a similar former case:

> This case involving the arcane principles of double jeopardy and collateral estoppel is not susceptible of bright-letter law or black-letter law; the areas are most often gray, and dimly to be seen. Needless to say, one entering this field must do so with trepidation.
>
> As a result, the battles in these areas are pockmarked by assaults, retreats, and advances.  In both fields we look for terrain that has been fought over, and cast our eyes about for tactical maneuvers in order to discover some grand design which really and in fact can fit the particular case before us for judgment and disposition.  But we find no classic to compare to the Clausewitz of military fame.  We too are thus hesitant to enter the field, but we shall do so bravely. And, at analysis' end, we are confident that contemporary jurisprudence justifies our conclusion.

United States v. Larkin, 605 F.2d 1360, 1361–62 (5th Cir. 1979), partially withdrawn and modified on other grounds by 611 F.2d 585 (1980).

As explained below, we need not wade into the murky waters of what constitutes the same offense in order to resolve this case—a fact that is fortunate for the State.  Its rigid and categorical approach to "sameness" simply cannot be squared with the holdings of Ex parte Nielsen, 131 U.S. at 187 (holding that a conviction of a Mormon on a charge of cohabiting with his two wives over a 2 1/2-year period barred a subsequent prosecution for adultery with one of them on the day following the end of that period); Harris v. Oklahoma, 433 U.S. 682, 682–83, 97 S. Ct. 2912 (1977) (per curiam) (holding that defendant's conviction for felony murder based on a killing in the course of an armed robbery barred a subsequent prosecution against the same defendant for the robbery); Illinois v. Vitale, 447 U.S. 410, 419–20, 100 S. Ct. 2260 (1980) (holding that double jeopardy may preclude involuntary manslaughter prosecution of automobile driver who had previously been convicted for failing to reduce speed to avoid the collision); Whalen, 445 U.S. at 693–94 (1980) (holding rape and felony murder are the same offense under Blockburger where felony murder conviction could not be had without proof of the rape); and even Justice Scalia's opinion in Dixon itself, see 509 U.S. at 700 (deciding, along with Justice Kennedy, that a prior conviction for criminal contempt precludes subsequent prosecution for the crime of assault)—all of which require something more than a copy of a state's criminal code in order to determine whether one charged offense is actually included in another.  See also United States v. Kaiser, 893 F.2d 1300, 1305–06 (11th Cir. 1990) (determining, under Blockburger, that the defendant's charge "of filing a false return is a lesser included offense of tax evasion by

20

court.

## III.

The Fifth Amendment guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. V.[8] Based on its plain text, the Amendment requires that criminal defendants demonstrate two things in order to invoke its protection: (1) that they have been "twice put in jeopardy"; and (2) that they have been so put for the "same offense."

---

means of filing the same false return," notwithstanding the fact that, "in the abstract," each offense has an element not required for the other, and stating "we do not decide the issue at hand in the abstract").

　　Its true that, in Dixon, a highly fractured Court overruled Grady v. Corbin and its "same-conduct" extension of the Ex parte Nielsen line of cases. Id. at 704 (majority opinion). But in overruling Grady's gloss and declaring Blockburger to be the sole test of what constitutes the same offense, the Court did not overrule the cases listed above. In fact, the opinion of Justice Scalia—representing the controlling interpretation of Blockburger and the cases listed above, given that there were four dissenting votes in Dixon to retain Grady's full-blown "same conduct" test—applied Blockburger in a way that incorporated the holdings of these cases within the Blockburger rubric. See id. at 697–702. The Government's argument in this case does not reflect the view of the Supreme Court, as illustrated by Dixon. Instead it represents the dissenting view of Chief Justice Rehnquist from that case. E.g., id. at 714 (Rehnquist, J., concurring in part, dissenting in part) ("In my view, Blockburger's same-elements test requires us to focus, not on the terms of the particular court orders involved, but on the elements of contempt of court in the ordinary sense. . . . Because the generic crime of contempt of court has different elements than the substantive criminal charges in this case, I believe that they are separate offenses under Blockburger."); id. at 716–17 ("Our double jeopardy cases applying Blockburger have focused on the statutory elements of the offenses charged, not on the facts that must be proved under the particular indictment at issue."). But even the Chief Justice's dissenting voice allowed that Harris imports some measure of flexibility into Blockburger in cases "where the crimes in question are analogous to greater and lesser included offenses." Id. at 714; accord Whalen, 445 U.S. at 708–09 (Rehnquist, J., dissenting) ("[T]he Blockburger test, although useful in identifying statutes that define greater and lesser included offenses in the traditional sense, is less satisfactory, and perhaps even misdirected, when applied to statutes defining "compound" and "predicate" offenses. Strictly speaking, two crimes do not stand in the relationship of greater and lesser included offenses unless proof of the greater necessarily entails proof of the lesser."). See also United States v. Liller, 999 F.2d 61, 62–63 (2d Cir. 1993).

[8] The Double Jeopardy Clause of the Fifth Amendment applies to the State through the Due Process Clause of the Fourteenth Amendment. Benton v. Maryland, 395 U.S. 784, 89 S. Ct. 2056 (1969).

Because Delgado cannot show that he was "twice put in jeopardy," as the Supreme Court's constitutional jurisprudence defines that concept, the State was not precluded from retrying him for premeditated murder.

A.

In the context of successive prosecutions, the Fifth Amendment's double-jeopardy prohibition "was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." Green v. United States, 355 U.S. 184, 187, 78 S. Ct. 221 (1957).

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

Id. at 187–88.

"The Double Jeopardy Clause," however, "is not an absolute bar to successive trials." Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 308, 104 S. Ct. 1805 (1984). For over a hundred years, the Supreme Court has recognized that the Fifth Amendment does not generally prohibit retrying defendants who succeed in having their convictions set aside on appeal. See Ball v. United States, 163 U.S. 662, 671–72, 16 S. Ct. 1192 (1896) (establishing the "Ball rule"); Lockhart v. Nelson, 488 U.S. 33, 38, 109 S. Ct. 285 (1988) ("It has long been settled . . . that the Double Jeopardy Clause's general prohibition

22

against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." (citing Ball, 163 U.S. at 671–72)).  Justice Harlan, writing for the Court in United States v. Tateo, explained the Ball rule's rationale in the following terms:

> Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial.  It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.

377 U.S. 463, 466, 84 S. Ct. 1587 (1964); see also United States v. Scott, 437 U.S. 82, 91, 98 S. Ct. 2187 (1978) ("[R]equir[ing] a criminal defendant to stand trial again after he has successfully invoked a statutory right of appeal to upset his first conviction is not an act of governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect.").

Doctrinally, the Supreme Court has reconciled the tension between the Fifth Amendment's text and the Ball rule through the concept of "continuing jeopardy." See Lydon, 466 U.S. at 308 ("[I]mplicit in the Ball rule permitting retrial after reversal of a conviction is the concept of 'continuing jeopardy.'" (citing Price v. Georgia, 398 U.S. 323, 329, 90 S. Ct. 1757 (1970))).  Jeopardy is said to "attach" when a defendant is "put to trial."[9]  Serfass v. United States, 420 U.S. 377, 388, 95

---

[9] "This state of jeopardy attaches when a jury is empaneled and sworn, or, in a bench trial, when the judge begins to receive evidence." Martin Linen Supply Co., 430 U.S. at 569.

S. Ct. 1055 (1975). But "the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy." Richardson v. United States, 468 U.S. 317, 325, 104 S. Ct. 3081 (1984). Drawing from Justice Holmes's dissenting views in Kepner v. United States, 195 U.S. 100, 134–36, 24 S. Ct. 797 (1904), and relying on considerations of "fairness to society, lack of finality, and limited waiver," see Lydon, 466 U.S. at 308; Price, 398 U.S. at 329, the Supreme Court has determined that most appellate reversals of convictions do not qualify as such terminating events because the "'criminal proceedings against [the] accused have not run their full course.'" See Lydon, 466 U.S. at 308 (quoting Price, 398 U.S. at 326). In other words—and particularly in light of the fact that the defendant was theretofore under a verdict of guilt—in a very real sense, the defendant was never out of jeopardy. Since it stands to reason that a defendant cannot be put in jeopardy a second time when his original jeopardy has yet to end, the Ball rule does not offend the Double Jeopardy Clause.

B.

Despite its breadth, the Ball rule and its implicit concept of continuing jeopardy permits a critical exception. In Burks v. United States, the Supreme Court held that if a conviction is set aside for insufficiency of the evidence, "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." 437 U.S. 1, 11, 98 S. Ct. 2141 (1978). Establishing a key Fifth

24

Amendment dichotomy between appellate reversals for trial error versus factual insufficiency, Chief Justice Berger explained for a unanimous Court:

> [R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished. ... Since we necessarily afford absolute finality to a jury's verdict of acquittal—no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty.

Id. at 15–16.

Burks therefore saves convictions set aside because of evidentiary insufficiency from the Ball rule's sweep, terminating a defendant's jeopardy as to that offense and triggering the full protection of the Double Jeopardy Clause. See Nelson, 488 U.S. at 39. But where Burks does not apply, and a conviction is reversed on the basis of legal error, the defendant's jeopardy continues and a second trial is permitted under Ball. See North Carolina v. Pearce, 395 U.S. 711, 720, 89 S. Ct. 2072 (1969) (declaring, pre-Burks, that the double jeopardy guarantee "imposes no limitations whatever upon the power to retry a defendant who has succeeded in getting his first conviction set aside.")(emphasis added).

IV.

25

A.

Delgado was convicted in his first trial and succeeded in having that conviction set aside on appeal. As a result, his Fifth Amendment claim rises (and, in this case, falls) with his ability to show that the Florida Supreme Court decision in Delgado I "acquitted" him of felony murder and burglary.

An "acquittal" is a decision by a court or a jury in favor of the defendant that "'actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.'" Smith v. Massachusetts, 543 U.S. 462, 468, 125 S. Ct. 1129 (2005) (quoting Martin Linen Supply Co., 430 U.S. at 571). In Delgado I, the Florida Supreme Court addressed Delgado's burglary charge and found that it was "legally inadequate." Delgado I, 776 So. 2d at 242 (emphasis added). Stating explicitly that "[t]his [was] not a case where there was merely insufficient evidence to support the burglary charge," id., the court determined that its "holding on the burglary issue compel[led it] to remand this case for a new trial," id. at 241. It analogized Delgado's case to Yates, a case in which the Supreme Court found constitutional error, but permitted retrial, where a jury returned a general verdict after having been instructed on alternate theories of guilt, only one of which was legally adequate. And it specifically distinguished it from Griffin, where the Supreme Court decided that, where a jury is charged on alternate theories of guilt—only one of which is factually adequate—a general guilty verdict will stand.

26

Moreover, when addressing Delgado's double-jeopardy arguments in

Delgado II, the Florida Supreme Court confirmed that it did not set aside

Delgado's initial conviction on the basis of evidentiary insufficiency:

> While we recognize that an acquittal is required when a conviction is not supported by factually sufficient evidence, see, e.g., Ballard v. State, 923 So. 2d 475, 486 (Fla. 2006) (reversing convictions, vacating sentences, and remanding with directions to enter a judgment of acquittal where evidence was insufficient to support convictions), and that such an acquittal gives rise to double jeopardy protections, Sattazahn v. Pennsylvania, 537 U.S. 101, 123 S. Ct. 732, 154 L.Ed.2d 588 (2003), this Court did not effectually acquit Delgado of first-degree murder in Delgado I. In Delgado I, we discussed at length the distinction between legal and factual insufficiency and expressly stated that "[t]his is not a case where there was merely insufficient evidence to support the burglary charge." Id. at 242 (emphasis added). Rather, we stated that "[p]ursuant to our analysis in today's opinion, [the State's] theory of burglary (and felony murder) is legally inadequate." Id. (emphasis added). We did not find that either of the State's theories of first-degree murder was factually insufficient and expressly stated that "[o]ur decision in no way prevents the State from prosecuting appellant for whatever crimes he may have committed once inside the victim's home." Id. at 241. In fact, the only factual insufficiency we recognized was consequent to our holding that the State was required to show that Delgado remained in the Rodriguezes' dwelling surreptitiously in order to prove Delgado committed burglary. Id. at 242.
>
> Moreover, even if the State's theory of felony murder was rendered factually insufficient by our holding in Delgado I, we expressly recognized that a defendant may be retried on the same count where one of two alternative theories is factually insufficient but the other is not. Id. (citing Griffin v. United States, 502 U.S. 46, 112 S. Ct. 466, 116 L.Ed.2d 371 (1991); San Martin v. State, 717 So.2d 462, 470 (Fla.1998)). Thus, because the State's alternative theory of first-degree murder based on premeditation was not held to be factually insufficient in

27

> Delgado I, Delgado was not effectually acquitted of
> first-degree murder.

Delgado II, 948 So. 2d at 686–87.

We conclude that the substance of the Florida Supreme Court's analyses in both Delgado I and Delgado II demonstrates that Delgado's original conviction was set aside on the basis of a legal "error in the proceedings," not factual insufficiency.[10] See Tateo, 377 U.S. at 465. Consequently, the general rule of Ball, not the exception of Burks, applies to this case, and the Florida Supreme Court reasonably relied on the Yates doctrine.

Of course it is true that, in a sense, by finding the State's burglary theory legally deficient, the Florida Supreme Court was also finding that the State's presentation was factually inadequate. But that factual inadequacy arose only as a result of the reviewing court's reinterpretation of the governing law. See Parker v. Lockhart, 797 F. Supp. 718, 721 (E.D. Ark. 1992) ("The proof 'failed' only

---

[10] Ordinarily, a court's characterization of its own ruling is not dispositive of whether its ruling was, in fact, an acquittal, for double jeopardy purposes, see Smith v. Massachusetts, 543 U.S. 462, 468–69, 125 S. Ct. 1129 (2005); but in Parker v. Lockhart, 797 F. Supp. 718, 722 (E.D. Ark. 1992), the district court interpreted the following statement from Tibbs v. Florida as indicating that that rule is inapplicable in a case like Delgado's: "[the state supreme] court's construction of its prior opinion binds this Court." See 457 U.S. 31, 47 n. 24, 102 S. Ct. 2211 (1982) (citing Greene v. Massey, 437 U.S. 19, 25–26 & nn.8–10, 98 S. Ct. 2151 (1978)).

It is unclear whether the rule established in Greene requires simply that we defer to a state court's interpretation of its own ambiguous prior decision with respect to what that decision said as a matter of historical fact, or, as Parker assumed, whether that later interpretation also eliminates our responsibility under Smith to evaluate the effect of the prior ruling as a matter of double-jeopardy law. We suspect it was the former, see Rivera v. Sheriff of Cook Cnty., 162 F.3d 486, 489 (7th Cir. 1998) ("Interpretation [under the Greene rule] of an ambiguous statement by a judge does not present any question of constitutional law. The question is what the speaker sought to convey, not what a rule of law compels the state to do; it is a question of fact for the same reason that 'the state of a man's mind is as much a fact as the state of his digestion.'"), but we take no position on the matter because the opinion of Delgado I was not ambiguous and, either way, the Greene rule does not impact our decision.

28

because the Arkansas Supreme Court construed the capital felony murder law not to apply to the facts all agreed were proved at Parker's first trial.").[11]  This was simply not a case where the prosecution sought "another opportunity to supply evidence which it failed to muster in the first proceeding."  Burks, 437 U.S. at 11.  Given that fact, we believe the Florida Supreme Court properly determined that the Burks exception did not apply.  See Parker, 797 F. Supp. at 725; State v. Wright, 203 P.3d 1027, 1031 & n.5 (Wash. 2009) (en banc) (characterizing an analogous appellate reversal of a felony-murder conviction as "result[ing] from trial error, not insufficient evidence," and declaring  "[t]he problem of conviction for a non-existent crime is not a failure of proof" (internal quotation marks omitted)); United States v. Lanzotti, 90 F.3d 1217, 1221–22 (7th Cir. 1996).

---

[11]  In Parker, the district court addressed a double-jeopardy question nearly identical to that presented in this case.  Parker had been tried and convicted of two capital felony murders for two killings in the course of burglary.  See Parker v. State, 731 S.W.2d 756, 757 (Ark. 1987).  The burglary, however, was predicated solely upon Parker's breaking and entering the victims' home in order to commit the murder.  Id.  On direct appeal, the Arkansas Supreme Court reversed Parker's conviction because it determined that the burglary statute could not be construed to encompass the facts established at Parker's trial.  Id. at 425–26.  Parker was then retried and convicted of capital murder for "causing the death of two or more persons in the course of the same criminal episode."  Parker, 797 F. Supp. at 719.  He appealed on Double Jeopardy grounds, but the Arkansas Supreme Court rejected his claim, deciding that his "original conviction was not reversed because the evidence was insufficient, but because the state had committed 'trial error' in 'charging and trying Parker under the wrong capital murder provision.'"  Id.  On habeas review, the district court agreed, deciding:

> The [Arkansas Supreme Court] in [Parker's first direct appeal] examined the applicability of the law, not the adequacy of the proof.  If the evidence was in any sense "insufficient" to convict under the felony murder statute, it was only because the court narrowly construed the statute to make it inapplicable to the proof offered at trial.  The conviction was reversed, therefore, based the court's view of the law, not its view of the evidence.

Id. at 722–33.

29

We find support for this conclusion in several cases where the Supreme Court has addressed analogous situations.

In Lockhart v. Nelson, for example, the Supreme Court addressed a case in which "a reviewing court set aside a defendant's conviction of enhanced sentence because certain evidence was erroneously admitted against him, and further held that the Double Jeopardy Clause forbade the State to retry him as a habitual offender because the remaining evidence adduced at trial was legally insufficient to support a conviction." 488 U.S. at 34.[12] Applying "the logic of Burks," the Court determined that the Double Jeopardy Clause did not bar the defendant's retrial where the evidence was sufficient from the vantage of the trial court, and only later determined to be insufficient because of an unknown legal error.[13] Id. at 40. Had the error come to light, the Court observed, the prosecution "would presumably [have had] an opportunity to offer [other] evidence" to bridge the evidentiary gap. Id. at 42. "Permitting retrial in this instance is not the sort of governmental oppression at which the Double Jeopardy Clause is aimed." Id.

---

[12] Following a guilty plea for burglary, the prosecution in Nelson sought to enhance Nelson's sentence under Arkansas's habitual-offender statute. 488 U.S. at 34–35. Per the statute, the prosecution introduced copies of the minimum-required number of prior felony convictions. Id. at 36. "Unbeknownst to the prosecutor, one of those convictions had been pardoned by the Governor several years after its entry." Id. at 36. Nelson sought a writ of habeas corpus in federal district court and succeeded in having his sentence invalidated. Id at 37. After the prosecution announced its intention to pursue the same enhancement at resentencing on the basis of another conviction, "the District Court decided that the Double Jeopardy Clause prevented the State from attempting to resentence [Nelson] as a habitual offender." Id.

[13] The Nelson Court emphasized that there was no evidence of prosecutorial misconduct or overreaching, see 488 U.S. at 34, implying—correctly, we think—that had there been evidence of either, the Double Jeopardy analysis might be very different. Likewise, in Delgado's case, there is no allegation that the prosecutors acted in bad faith by pursuing this burglary charge. The legal theory was sound in light of then-governing law.

30

As in Nelson, the Florida Supreme Court's reversal here "'implie[d] nothing with respect to the guilt or innocence of the defendant,' but . . . simply '. . . determin[ed] that he ha[d] been convicted through a judicial process which [was] defective in some fundamental respect.'" Id. at 40 (quoting Burks, 437 U.S. at 15). And similar to Nelson, the evidence here was sufficient at the time of trial. See id. at 40. Since the basis for the Burks exception is that "the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal, rather than submitting the case to the jury," see Nelson, 488 U.S. at 39 (citing Burks, 437 U.S. at 16–17), a reviewing court's application of that exception should consider the sufficiency of the evidence at the time of trial. See id. at 41–42. It is the "quantum of evidence" at that point that counts. Id. at 42; accord Parker, 797 F. Supp. at 723.[14]

Additionally, the Supreme Court has declined to bar retrial following after a reversed conviction where the prosecution had simply relied on the wrong statute in its charging document. See Montana v. Hall, 481 U.S. 400, 404, 107 S. Ct.

---

[14] The Parker court reasoned:

> To look at it another way, had the Arkansas Supreme Court determined that the law was indeed what the jury in Parker's case had been instructed, that is, that burglary could be the predicate felony when the object of the burglary was the murder, it is undisputed that the evidence offered at trial was sufficient to convict Parker. The problem, therefore, was the applicability of the law to the evidence (legal inapplicability), not the applicability of the evidence to the law (factual inapplicability). The inadequacy was in the statute (or, more accurately, in the prosecutor's and trial judge's understanding of the statute), not the proof.

797 F. Supp. at 723.

31

1825 (1987) (per curiam) ("It is clear that the Constitution permits retrial after a conviction is reversed because of a defect in the charging instrument." (citing Ball, 163 U .S. at 672)).

We are mindful that the Florida Supreme Court's decision forced Delgado to "run the gauntlet" of trial for a second time through no fault of his own—a fact implicating various interests protected by the Double Jeopardy Clause. See Abney v. United States, 431 U.S. 651, 97 S. Ct. 2034 (1977); Green, 355 U.S. at 187–88; Nelson, 488 U.S. at 44 (Marshall, J., dissenting) (characterizing the State's "'honing [of] its trial strategies and perfecting [of] its evidence through successive attempts at conviction'" as "the classic Double Jeopardy evil" (quoting Tibbs v. Florida, 457 U.S. 31, 41, 102 S. Ct. 2211 (1982))); Illinois v. Somerville, 410 U.S. 458, 471, 93 S. Ct. 1066 (1973) (stating that the defendant has a "weighty" interest "in having his fate determined by the jury first impaneled"). But, as discussed above, those interests must be balanced against the countervailing interests of society. See Tateo, 377 U.S. at 466.

The Florida Supreme Court determined that the error in Delgado's original prosecution was legal, not factual. That conclusion was entirely correct in light of governing law, and it was entirely fatal to Delgado's double jeopardy claim. Because the Florida Supreme Court did not acquit Delgado in his first direct appeal, his Fifth Amendment rights were not violated.

B.

Furthermore, even if we were to conclude that the Florida Supreme Court did acquit Delgado of felony murder and burglary in Delgado I, severing his original jeopardy as to those charges, it would likely not change the result.

The error, legal or factual, addressed by the Florida Supreme Court in Delgado I was confined to issues unrelated to the premeditated murder charge (i.e., consent to enter and remain in the premises). There is no argument to be made, therefore, that the Florida Supreme Court resolved "some or all of the factual elements of the offense" of premeditated murder in Delgado's favor in Delgado I. See Martin Linen Supply Co., 430 U.S. at 571. Consequently, there is little distinguishing Delgado's case from the more traditional scenario where a defendant, tried for two offenses that are well understood to be greater- and lesser-included crimes, is acquitted of the greater offense and convicted of the lesser, only to have that conviction set aside on appeal. In that case, it is beyond doubt that if the conviction were reversed for any reason other than evidentiary insufficiency, the prosecution would be entitled to retry the defendant for the lesser-included charge. See United States v. Larkin, 605 F.2d 1360, 1367–68 (5th Cir. 1979), modified by 611 F.2d 585 (1980) (resolving an analytically identical situation where the defendant made a substantially stronger showing that he had actually been acquitted of a greater-included offense).[15]

---

[15] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Delgado's jeopardy on the premeditated murder charge attached when his original jury was sworn and continued through his second prosecution. Therefore, he was not "twice put in jeopardy" for that offense. See id.;[16] accord United States v. Howe, 538 F.3d 820, 826–27 (8th Cir. 2008), abrogated on other grounds by Yeager v. United States, __ U.S. __, 129 S. Ct. 2360, 2367–68 (2009); United States v. Jose, 425 F.3d 1237, 1241 (9th Cir. 2005) (reaching the same conclusion

[16] The Larkin court explained:
> Even if we assume that [he was acquitted of the greater-included offense in his first trial], Larkin's double jeopardy right will not be violated by the retrial of the [lesser-included offense].
>
> In Brown, Jeffers, and Harris, the defendants had been subjected to two independent proceedings. In each case, trial on either the greater or the lesser charge was followed by a prosecution of the other offense in a separate proceeding. In contrast, Larkin was subjected to only one trial in which the conspiracy and vicarious liability counts were tried simultaneously. Thus, even assuming the validity of Larkin's argument that the conspiracy charge is a lesser included offense of the Pinkerton [v. United States, 328 U.S. 640, 66 S.Ct. 1180 (1946)] vicarious liability counts, Larkin's position is indistinguishable from a defendant who was tried on a murder charge and a manslaughter count in the alternative. Such simultaneous jeopardy for greater and lesser included offenses is clearly proper. See Jeffers, supra, 432 U.S. at 152 & n. 20, 97 S. Ct. at 2217 & n. 20 ("a defendant is normally entitled to have charges on a greater and a lesser offense resolved in one proceeding") (plurality opinion).
>
> Furthermore, the fact that the jury in Larkin's trial acquitted him of the Pinkerton counts and hung on the conspiracy charge, thereby causing a mistrial as to the latter count and allowing the Government to retry the conspiracy charge, does not dictate a different result. It is of course axiomatic that Larkin may not be retried on the charges of which he was acquitted. See Price v. Georgia, 398 U.S. 323, 90 S. Ct. 1757, 26 L. Ed.2d 300 (1970); Green v. United States, 355 U.S. 184, 78 S. Ct. 221, 2 L. Ed.2d 199 (1957). However, it is equally well settled that a defendant may be retried on a lesser offense, of which he was convicted at an initial trial, after that conviction was reversed on appeal; and that that result obtains even though the first trial also resulted in a verdict of acquittal on a greater offense. See Price, supra, 398 U.S. at 326–27, 90 S. Ct. 1757.

Larkin, 605 F.2d at 1367–68 (footnotes omitted).

in the inverse scenario—where jeopardy terminated on the lesser-included offense and continued as to the greater—stating: "While the Double Jeopardy Clause does not bar retrial after reversal of a conviction, it does bar a successive trial on an offense not charged in the original indictment once jeopardy has already terminated on, what is for double jeopardy purposes, the 'same offense.'" (emphasis omitted)). Were we addressing a scenario where Delgado was not also charged for the lesser-included crime in the first proceeding (assuming he was acquitted on the greater-included charge), the State would be barred from bringing that new charge in a separate proceeding. See Harris, 433 U.S. at 682–83. But that is not this case.[17]

---

[17] Finally, we briefly address the parties' arguments related to collateral estoppel and exhaustion. See Ashe v. Swenson, 397 U.S. 436, 90 S. Ct. 1189 (1970) (holding that the Double Jeopardy Clause incorporates the doctrine of collateral estoppel in criminal proceedings).

"Collateral estoppel, or, in modern usage, issue preclusion, 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" Schiro v. Farley, 510 U.S. 222, 232, 114 S. Ct. 783 (1994) (quoting Ashe, 397 U.S. at 443). To be relevant to a double jeopardy argument such as that raised by Delgado, collateral estoppel requires that the defendant have actually had "an issue of ultimate fact" resolved in his favor in a prior proceeding. See id. Based on the analysis of Section IV above, it is clear that Delgado did not have any factual issues resolved in his favor, and, hence, collateral estoppel has no place in this case's double-jeopardy analysis.

Nevertheless, the district court determined that Delgado's federal petition raised a separate Fifth Amendment claim for relief on the basis of collateral estoppel and concluded that this separate claim was procedurally barred for failure to exhaust state court remedies. On appeal, Delgado argues this was error because he did not raise a separate collateral estoppel claim, but simply invoked the concept of collateral estoppel in support of his Burks-driven double jeopardy argument:

> . . . DELGADO was never making a separate collateral estoppel claim. He made it clear in his Memorandum of Law that the collateral estoppel argument was being linked to the Burks case. In other words, the ultimate fact was DELGADO's judicial acquittal of burglary, which included premeditation as a lesser-included of the felony-murder pursuant to the instructions of the Court, DELGADO never pled collateral estoppel as to any fact presented to the jury . . . . DELGADO is claiming, and has always maintained that this retrial is

35

V.

In light of the foregoing discussion, Delgado has not demonstrated that the Florida Supreme Court's denial of relief was "contrary to, or involved an unreasonable application of, clearly established Federal law." § 2254(d). We therefore affirm the district court's denial of his application for habeas relief.

**AFFIRMED.**

---

barred by the judicial acquittal of the Florida Supreme Court because of Burks.

If Delgado had raised a separate and distinct claim for relief on a collateral estoppel theory, the district court certainly would have been correct in deeming it procedurally defaulted. See Coleman v. Thompson, 501 U.S. 722, 731–32, 111 S. Ct. 2546 (1991). However, in light of the record, it seems more likely to us that, per his appellate explanation, Delgado's invocation of collateral estoppel was merely a misguided attempt to bolster the double jeopardy claim addressed above. Moreover, our categorization of Delgado's collateral estoppel argument is utterly irrelevant to its impact on this case.

Exhaustion is about substance, not form. And we believe that the record in this case demonstrates the following things clearly: the substance of Delgado's sole federal constitutional claim was that his retrial for premeditated murder violated the Fifth Amendment's Double Jeopardy Clause because he was judicially acquitted of the same offense in Delgado I; he presented that argument, fully and fairly, to the Florida Supreme Court; and, based upon its ruling that completely and properly rejected Delgado's constitutional grievance, that court plainly understood it. This is not the stuff of procedural default. See O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728 (1999) ("[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts."); Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509 (1971) ("[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied.").

Consequently, we decide to avoid a profitless and difficult analysis of what truly constitutes a separate claim or argument for exhaustion purposes and simply conclude that Delgado's petition was due to be denied, in full, on its merits.

36