[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-14969

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JASON GATLIN,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cr-20163-RS-1

_____

_____

No. 20-14149

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JASON GATLIN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cr-20163-RS-1

_____

Before JORDAN, LUCK, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

Jason Gatlin appeals his convictions and sentences for sex trafficking of a minor, production of child pornography, and witness tampering. On appeal, Gatlin raises several arguments in challenging his convictions and sentences. After careful review, and with the benefit of oral argument, we affirm Gatlin's convictions and sentences as to Counts 1 and 2 but reverse his conviction and

sentence as to Count 3.  We also affirm the district court's restitution order.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Gatlin's Relationship with and Trafficking of E.H.

E.H.[1] ran away from home when she was sixteen years old. She began using drugs, starting with marijuana and escalating to MDMA.  According to E.H., she was unable to get a job, so she traded sex for money and drugs.

In October 2018, J.C., E.H.'s friend at the time, introduced E.H. to Gatlin.  Gatlin and E.H. first interacted by talking on the phone and eventually began a sexual relationship.  When they first met in person, Gatlin picked up E.H. and took her to a hotel in Florida City, where he paid her about $40 and gave her some drugs in exchange for sex.  When E.H. first met Gatlin, she told him that she was seventeen years old.

Subsequently, the two stayed in contact, and E.H. believed that they were in a romantic relationship.  E.H. began saying that she was eighteen years old, despite being seventeen years old, because she wanted to protect their relationship.  Gatlin and E.H. took at least two trips to Key West, where they stayed together in a house that Gatlin was working on.  Throughout this relationship, Gatlin took at least one photograph of them having sex.

---

[1] The names of the minors in this case have been omitted to preserve their anonymity.

During this time, Gatlin became E.H.'s de facto pimp. Gatlin told at least one customer that he was E.H.'s "manager." Gatlin booked hotel rooms for E.H. so that she could engage in sex with customers. He also paid for E.H.'s food, supplied her with MDMA, drove her to the Florida Keys where she would prostitute herself, and allowed her to stay in the house that he was working on there. Additionally, Gatlin coached E.H. to charge more money in the Florida Keys than in Miami given the high presence of tourists and taught her sexual "tricks" so that she could continue to engage in prostitution. In return, Gatlin expected a cut of E.H.'s earnings.

The relationship between Gatlin and E.H. soured quickly. Gatlin became angry that E.H. was having sex with other men. Similarly, E.H. was irate to learn that Gatlin was having sex with other women.

Things came to a head on November 30, 2018. While the two were staying together in the Florida Keys, E.H. threatened to call the police on Gatlin. The situation became violent. As a result of her fight with Gatlin, E.H. suffered injuries to her nose and mouth. On the way back to Miami after their physical altercation, Gatlin threatened E.H. She became scared and asked Gatlin to pull over at a convenience store so that she could use the bathroom. Once inside, she locked herself in the bathroom and called the police. Gatlin then left her there.

Officers from the local sheriff's office responded to E.H.'s call, and after interviewing her, brought her to a hospital, where

she spoke with additional officers.  Gatlin was arrested three days later.

## B.  Gatlin's Pretrial Tampering with E.H.

Before trial, Gatlin made two attempts to tamper with E.H.'s testimony.  First, in the period after E.H. spoke with law enforcement but prior to his arrest, Gatlin gave E.H. money and food and told her to recant her statements to the police.

Second, after he was arrested, Gatlin told his mother to convince E.H. to recant.  In a prison call, Gatlin told his mother that he would "get out immediately" if E.H. said she was lying and that it would take "[o]ne thousand dollars," because "[p]eople will do all kinds of stuff for that."  Gatlin's mother said that she understood and that she would "try and do the best [she] can to get [Gatlin] out of there."  At the time, E.H. did not have permanent housing and was living with Gatlin's mother.  In a later call, Gatlin told E.H. directly that all she had to do was go into court and change her statements in a sworn affidavit.  Sometime later, Gatlin's mother drove E.H. to the public defender's office, where E.H. tried to recant her statements to Gatlin's public defender, who eventually relayed her recantation to the Federal Bureau of Investigation ("FBI").  E.H. continued living with Gatlin's mother following that encounter.  At trial, E.H. said she tried to recant her statements because she "needed a place to stay."

## C.  Indictment and Trial

A grand jury charged Gatlin via a superseding indictment with one count of sex trafficking of a minor, in violation of 18

U.S.C. § 1591 ("Count 1"); one count of production of child pornography, in violation of 18 U.S.C. § 2251 ("Count 2"); and one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3) ("Count 3").

Gatlin's trial began on September 5, 2019, and lasted eight days. At the close of evidence, the district court instructed the jury. Regarding Count 1, the district court instructed the jury that the government was required to prove that Gatlin trafficked E.H. either:

> (a) knowing or in reckless disregard of the fact that means of force, threats of force, or coercion will be used to cause the person to engage in a commercial sex act, or (b) in reckless disregard of the fact that the person has not attained the age of 18 years, or having had a reasonable opportunity to observe the person, and knowing or in reckless disregard of the fact that the person will be caused to engage in a commercial sex act.

In other words, the district court instructed the jurors that to find Gatlin guilty of sex trafficking, they had to find that Gatlin either acted: (a) by means of force, threats of force, or coercion; or (b) in reckless disregard of the fact that E.H. was a minor. The district court and the parties agreed to an interrogatory verdict form for Count 1. That verdict form first asked whether the jury found Gatlin guilty and, if so, whether it was by use of force or by reckless disregard of the fact that the victim was a minor.

At first, the jury found Gatlin guilty on all counts. However, on the interrogatory verdict form, the jury did not find either of the conditions necessary to trigger liability, i.e., use of force or reckless disregard of the fact that the victim was a minor. Because of this inconsistency, defense counsel asked the district court to "direct a verdict of not guilty . . . as to Count 1," but defense counsel did not specify the grounds for doing so. The district court declined. Instead, reasoning that the jury had returned an inconsistent verdict and "the verdict [had not] been discharged," the district court clarified the instructions for the jury and directed them to continue deliberating. After further deliberations, the jury found Gatlin guilty under the second condition, i.e., that Gatlin acted in reckless disregard of the fact that E.H. was a minor.

## D. Sentencing

The case proceeded to sentencing. Prior to sentencing, a Presentence Investigation Report ("PSI") was prepared for Gatlin's case. For Count 1, sex trafficking of a minor, the PSI noted that the base offense level was 30. The PSI recommended a total increase of ten points, for an adjusted total level of 40, based on the following reasons: (1) E.H. had been in Gatlin's custody, care, or supervisory control; (2) Gatlin had influenced E.H. to engage in prohibited sexual conduct; (3) the offense involved the use of a computer; (4) the offense involved the commission of a sex act; and (5) Gatlin

had obstructed justice.[2] For Count 2, production of child pornography, the PSI noted that the base offense level was 32. It adjusted this offense level by eight points, reaching a total adjusted offense level of 40, reasoning as follows: (1) a two-point increase because E.H. was in Gatlin's custody, care, or supervisory control; (2) a two-point increase because the offense involved a sexual act; and (3) a four-point increase because the material produced portrayed sadistic or masochistic conduct or other depictions of violence. Based on the number of offenses and their levels, the PSI calculated that the total combined offense level was 42, to which it added a five-point increase because Gatlin qualified as a repeat offender. The PSI thus defaulted to the maximum offense level for the relevant offenses, which was 43. Next, in light of Gatlin's record, the PSI found that his criminal history category was IV. Based on Gatlin's total offense level and criminal history category, the PSI found that, under the United States Sentencing Guidelines, he should be sentenced to a term of life imprisonment.

The district court sentenced Gatlin to a term of life imprisonment—a term of life as to Count 1, 260 months as to Count 2, and 240 months as to Count 3, all to be served concurrently. The district court considered a multitude of factors, including the PSI, Gatlin's "extensive" criminal history, Gatlin's mental health issues,

---

[2] The adjustments to the offense level of Count 1 incorporated the sentence for Count 3 (witness tampering). Together, they are referred to as count group one in the PSI.

Gatlin's likelihood to reoffend and the need to protect the public, and Gatlin's prior violations of probation. After a separate hearing, the district court also ordered Gatlin to pay $1,700 in restitution.

Gatlin timely filed this appeal.[3]

## II.    STANDARDS OF REVIEW

"We review questions of constitutional law *de novo*." *United States v. Brown*, 364 F.3d 1266, 1268 (11th Cir. 2004). Similarly, whether a jury instruction properly states the law is a legal question that we review *de novo*. *United States v. Stone*, 9 F.3d 934, 937 (11th Cir. 1993).

"We review the sufficiency of evidence to support a conviction *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007). "We review the district court's application of the Sentencing Guidelines *de novo*, and its findings of fact for clear error." *United States v. Trujillo*, 146 F.3d 838, 847 (11th Cir. 1998). And "[w]e review *de novo* the legality of an order of restitution, but we review factual findings underlying a restitution order for clear error." *United States v. Washington*, 434 F.3d 1265, 1267 (11th Cir. 2006). "For a finding to be clearly erroneous, [we]

---

[3] We note that Gatlin first appealed the finding of guilt as well as the sentencing order. Gatlin then appealed in a separate notice of appeal the district court's restitution order. The government moved to consolidate the appeals, which we granted.

'must be left with a definite and firm conviction that a mistake has been committed.'" *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010) (quoting *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1137 (11th Cir. 2004)); *accord United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). Further, we review the reasonableness of a sentence "under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007).

And finally, we review errors that were forfeited because they were not timely raised in the district court for plain error. *See Greer v. United States*, 141 S. Ct. 2090, 2096 (2021). "To establish eligibility for plain-error relief, a defendant must satisfy three threshold requirements. *First*, there must be an error. *Second*, the error must be plain. *Third*, the error must affect substantial rights, which generally means that there must be a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id*. at 2096 (internal quotation marks omitted). If a defendant establishes that these three requirements are met, we then may exercise our discretion to notice the forfeited error but only if we determine that "the error had a serious effect on 'the fairness, integrity[,] or public reputation of judicial proceedings.'" *Id*. at 2096–97 (quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904–05 (2018)); *accord United States v. Coats*, 8 F.4th 1228, 1240 (11th Cir. 2021).

## III.    ANALYSIS

On appeal, Gatlin raises four arguments challenging his convictions and sentences. Specifically, Gatlin contends that: (1) there

was insufficient evidence to sustain the jury's guilty verdicts; (2) the district court violated his rights by directing the jury to continue deliberating after they reached an inconsistent verdict; (3) the district court improperly applied sentencing enhancements and imposed an unreasonable sentence; and (4) the order of restitution violated his constitutional rights. We address these arguments in turn.

### A. Whether There Was Sufficient Evidence to Sustain the Jury's Guilty Verdicts.

Gatlin argues that there was insufficient evidence to sustain each of his three convictions.

#### 1. Sex Trafficking of a Minor (Count 1)

We begin our analysis with Gatlin's conviction for sex trafficking of a minor. A person is guilty of sex trafficking of a minor under 18 U.S.C. § 1591(a)(1) when he (1) "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person," (2) "knowing, or . . . in reckless disregard of the fact, . . . that the person has not attained the age of 18 years," and (3) "knowing, or . . . in reckless disregard of the fact," that the person "will be caused to engage in a commercial sex act." As to the second element, where "the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the [g]overnment need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years." *Id.* § 1591(c).

Reviewing the record, we conclude that the elements of sex trafficking of a minor are met here.  First, there was substantial evidence presented at trial that showed Gatlin was E.H.'s pimp, thereby satisfying the first element.  According to E.H.'s trial testimony, Gatlin rented a room for E.H. at a Motel 6 and drove her there knowing that she was going to prostitute herself in the room (which she then did); coached her on pricing and sexual techniques; and drove her to the Florida Keys, allowed her to stay with him, and gave her food and drugs "[w]henever [she] asked."  At the very least, these facts demonstrate that Gatlin "harbor[ed], transport[ed], provide[d]," and "maintain[ed]" E.H.  *Id.* § 1591(a)(1); *see United States v. Mozie*, 752 F.3d 1271, 1286 (11th Cir. 2014) ("[Section 1591] applies to anyone who 'harbors' a minor who 'will be caused to engage in a commercial sex act.'  B.H. testified that she stayed at Mozie's house for five days and four nights while she worked as a prostitute for him.  That evidence is sufficient to convict Mozie . . . ." (citation omitted)).

As to the second element, the evidence presented at trial showed that Gatlin knew that E.H. was underage.  E.H. testified that, when she first met Gatlin, she told him she was seventeen.  That testimony is sufficient to lead a reasonable juror to conclude that Gatlin knew or had reckless disregard for the fact that E.H. was underage.

As to the third element, the evidence showed that Gatlin knew that E.H. would be "cause[d] to engage in commercial sex acts."  *See* 18 U.S.C. § 1591(a).  In addition to the enabling actions

Gatlin took as E.H.'s pimp discussed above, E.H. testified that Gatlin expected a cut of the money she made from her prostitution. The evidence presented at trial also showed that Gatlin knew E.H. was having sex for money and that he expected to reap some of the benefit by taking a cut of the money.

Gatlin argues, however, that "cause," as used in § 1591(a), means "something that produces an effect, result, or consequence" and that the "logical reading" of the statute's language of "knowing . . . the person . . . will be caused to engage in a commercial sex act" describes acts that the defendant intends to take, i.e., the defendant "means to 'cause' the minor to engage in commercial sex acts." According to Gatlin, § 1591 "does not criminalize commercial sex acts with a minor in general, but makes criminal only those instances where a minor *will be caused* to engage in commercial sex acts through the defendant's specific actions." And Gatlin argues that any of the acts of "assistance" he purportedly provided do not satisfy § 1591.

We conclude that Gatlin's argument as to this point is without merit. Section 1591(a) criminalizes certain actions by a defendant—recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting by any means a person—if the defendant knows that the minor "*will be caused* to engage in a commercial sex act." § 1591(a)(1) (Emphasis added). As an initial matter, we have held that criminal liability under § 1591 is not conditioned on the actual occurrence of any commercial sex act. *See United States v. Blake*, 868 F.3d 960, 977 (11th Cir.

2017) ("[T]he commission of a sex act is *not* an element of § 1591." (emphasis in original)). Rather, "a defendant need only put the victim in a position where a sex act *could* occur, regardless of whether a sex act eventually *did* occur." *Id.* (emphasis in original).

Again, on this record, we conclude that there was sufficient evidence to support the third element of § 1591, i.e., the evidence was more than sufficient for a jury to find that Gatlin knew that E.H. was a minor and knew that she would be caused to engage in commercial sex acts through his conduct. At trial, E.H. testified to the following. Gatlin knew E.H. was seventeen years old. Gatlin helped E.H. place online advertisements for prostitution and told her to charge higher prices in the Florida Keys. Gatlin took E.H. to a Motel 6 and paid for her room, knowing that E.H. would have sex for money with customers, and E.H. gave Gatlin money from prostitution so that he could pay for extra nights at the Motel 6. Gatlin would not stay at the hotels he rented for E.H., but, on at least one occasion, kept a key to her room. Gatlin bought E.H. food, gave her money and drugs while she stayed at various motels and expected E.H. to give him some of the money she earned from prostitution. E.H. also testified that various statements she made to the police were truthful.

We thus conclude that the evidence presented at trial was sufficient for a reasonable jury to find that Gatlin knew E.H. was a minor and that Gatlin knew that E.H. would be caused to engage in commercial sex acts through his conduct. Accordingly, we affirm Gatlin's conviction under § 1591 as to Count 1.

### 2. Production of Child Pornography (Count 2)

We now turn to Gatlin's conviction for production of child pornography under 18 U.S.C. § 2251. As relevant here, a person is guilty of violating § 2251 if he "employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct." § 2251(a).

Only the intent element—"for the purpose of producing any visual depiction of such conduct"—is at issue here. Gatlin contends that § 2251 requires a specific intent to produce child pornography and that child pornography produced incidentally to a sexual encounter is insufficient. Gatlin also argues that "[t]he undisputed evidence showed that [he] engaged in sexual activity with E.H. *and* took a photo, not that he engaged in sexual activity with E.H. *to* take a photo." (Emphasis in original).

Based on the evidence presented at trial, we conclude that the intent element was met here. Specific intent does not require that the defendant be "single-minded in his purpose. . . . [A person] 'is no less a child pornographer simply because he is also a pedophile.'" *See United States v. Lebowitz*, 676 F.3d 1000, 1013 (11th Cir. 2012) (quoting parenthetically *United States v. Sirois*, 87 F.3d 34, 39 (2d Cir. 1996)). Accordingly, "[t]he government was not required to prove that making explicit photographs was [Gatlin's] sole or primary purpose" for engaging in sexual activity with E.H.; instead, "it was enough to show that it was 'a purpose' for doing so." *Cf.*

*United States v. Miller*, 819 F.3d 1314, 1316 (11th Cir. 2016).  Moreover, "because specific intent . . . can be difficult to prove[,] . . . often circumstantial evidence must be introduced to allow the jury to infer intent."  *See United States v. Foshee*, 578 F.2d 629, 632 (5th Cir. 1978).[4]

Here, the evidence shows that Gatlin (1) intentionally had sex with a minor and (2) intentionally made a recording of that act by using his camera phone.  The jury first could reasonably infer that Gatlin, during sexual intercourse with E.H., reached for his camera phone, unlocked the phone, and accessed the phone's camera.  Additionally, the jury could reasonably infer, based on the angle of the "live photo" in question, that Gatlin had to hold his camera phone in front of him using at least one of his hands while he was having sexual intercourse with E.H.  Moreover, the short video contained in the "live photo" makes evident that Gatlin and E.H. "posed" for the photo by remaining still during sexual intercourse.  In other words, for Gatlin to make the recording of the sexual act, he had to engage in a sexual act with E.H. and intentionally pause in the middle of that act to take the "live photo."  A jury could reasonably infer from that pause that, for at least some fraction of time, Gatlin was engaged in sexual conduct with E.H. partly for the purpose of recording it.  *Cf. Lebowitz*, 676 F.3d at 1013 ("This is not a case of a security camera mechanically picking up a random act."

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

(quoting parenthetically *United States v. Ortiz-Graulau*, 526 F.3d 16, 19 (1st Cir. 2008))).  And we have previously rejected the incidental-pornographer argument that Gatlin raises here.  *See id.* ("Whether some other sexual encounter would have occurred even without recording equipment is irrelevant.  A reasonable jury could conclude [the defendant] violated 18 U.S.C. § 2251(a).").

We thus conclude that there was sufficient evidence to sustain Gatlin's conviction for production of child pornography and affirm Gatlin's conviction as to Count 2.

### 3.   *Witness Tampering (Count 3)*

We next address Gatlin's conviction for witness tampering. As relevant to Gatlin's case, a person violates 18 U.S.C. § 1512(b) if he "[(1)] knowingly uses intimidation, threatens, or corruptly persuades another person, . . . or engages in misleading conduct toward another person, with intent to . . . [(2)] hinder, delay, or prevent the communication . . . of information relating to the commission or possible commission of a Federal offense" "[(3)] to a law enforcement officer or judge of the United States."  Where a defendant acts to prevent a "person from communicating with law enforcement officers in general," the intent element is satisfied where there is "a *reasonable likelihood* that a relevant communication would have been made to a federal officer."  *Fowler v. United States*, 563 U.S. 668, 670 (2011) (emphasis in original) (interpreting 18 U.S.C. § 1512(a)(1), a nearly identical provision); *see also United States v. Chafin*, 808 F.3d 1263, 1274–75 (11th Cir. 2015) (finding plain error where a district court failed to apply the *Fowler* reasonable-

possibility standard to § 1512(b)(3)). Thus, the intent element presents a two-step framework. First, we must determine whether the defendant had the intent to mislead law enforcement in general. *Fowler*, 563 U.S. at 673. If he did, we then must ask whether there was a reasonable likelihood that a relevant communication would have been made to a federal officer. *Id.* at 677. The intent element is satisfied only if both prongs are met. And the government "must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.* at 678.

Following *Fowler*, our sister circuits that have considered this issue have diverged in their approaches to the reasonable likelihood standard. *See United States v. Johnson*, 874 F.3d 1078, 1082 (9th Cir. 2017). In *United States v. Tyler*, 732 F.3d 241 (3d Cir. 2013), the Third Circuit held that, to establish a "reasonable likelihood," "there must be evidence—not merely argument"—"of the witness's cooperation with law enforcement." *Id.* at 252 (quoting *United States v. Lopez*, 372 F.3d 86, 92 (2d Cir. 2004)). The court explained that "'the government need not prove that a federal investigation was in progress at the time the defendant committed [a] witness-tampering' offense" in § 1512. *Id.* (alteration in original) (quoting *United States v. Ramos-Cruz*, 667 F.3d 487, 498 (4th Cir. 2012)). The Third Circuit has also held that the reasonable likelihood standard is a "relatively low bar," as the government, under *Fowler*, "need only show that 'the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical.'" *Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 185 (3d Cir. 2017) (first quoting *United*

*States v. Smith*, 723 F.3d 510, 518 (4th Cir. 2013); then quoting *Fowler*, 563 U.S. at 678).

By contrast, the Fourth Circuit held that the federal nexus element of § 1512 "may be inferred by the jury from the fact that the offense was federal in nature, plus additional appropriate evidence." *Ramos-Cruz*, 667 F.3d at 497. In *Ramos-Cruz*, the court did not focus solely on the fact that the murder at issue was eventually prosecuted as a federal crime but also considered uncontested evidence, including (1) a state task force was formed shortly after the murder, which investigated the gang the defendant was a member of, (2) a detective's communication with federal authorities regarding the murder, and (3) informants testifying they had spoken with federal law enforcement officers. *See id.* And, in *United States v. Veliz*, 800 F.3d 63 (2d Cir. 2015), the Second Circuit adopted the Fourth Circuit's approach and found that sufficient evidence supported the jury's finding that the defendant had violated the witness tampering statute. *Id.* at 74–75.

Here, Gatlin asserts that he lacked the requisite intent to violate § 1512(b) because the evidence established that he asked E.H. to lie only to Gatlin's public defender, not a federal officer. In addressing this issue, we need not decide whether adopt the "additional appropriate evidence" approach of the Second and Fourth Circuits, *see Ramos-Cruz*, 667 F.3d at 497; *Veliz*, 800 F.3d at 74–75, because we conclude that the evidence presented by the government in this case established only a "remote, outlandish, or simply hypothetical" possibility that E.H.'s recantation statements would

reach federal officers, *see Fowler*, 563 U.S. at 673. Thus, viewing the evidence in the light most favorable to the government, no rational trier of fact could have found the federal nexus element of the crime to be met.

As an initial matter, we agree that the record evidence demonstrates Gatlin's intent to have E.H. lie by recanting her previous statements to state law enforcement. For example, E.H. testified that Gatlin's mother contacted her and told her to "recant [her] statements to say that everything that [she] had previously told law enforcement was untrue." E.H. also testified as to Gatlin's attempts to persuade her to hinder the investigation. Indeed, before Gatlin was arrested, he dropped off food and money to E.H. and told her to "tell them it wasn't true." A jury could reasonably infer that "them" was referring to law enforcement. And jail calls between Gatlin and E.H., as well as between Gatlin and Gatlin's mother, further demonstrate this intent.

But, to prove a violation of § 1512(b), the government must also show that there was a reasonable likelihood that a relevant communication would have been made to a federal officer. *Fowler*, 563 U.S. at 677. And here, while the issue is admittedly a close call, we conclude that the government's evidence does not establish more than a "remote" or "simply hypothetical" possibility that E.H.'s recantation statements could have reached a federal officer. *See id.* at 678. E.H.'s statements were given to the *state* public defender's office and were intended by Gatlin to influence and mislead the *state* prosecution—specifically, the state prosecutor, who is

a law enforcement officer under Florida law. At the time E.H. gave those statements, federal charges had not been filed against Gatlin. Furthermore, the record shows that when Gatlin was arrested, he "thought [he] was only going to be charged with battery," which is a state offense.

We find that this case bears marked similarities to our decision in *Chafin*. In *Chafin*, we concluded that the defendant had demonstrated plain error as to his witness tampering conviction because the government had not introduced evidence showing that the defendant's statements to a state law enforcement agent investigating an alleged misuse of a jail commissary account were reasonably likely to be communicated to federal authorities. *See* 808 F.3d at 1274. Rather, it was "just the opposite": the government proved only that the state agent told the defendant that the local district attorney had initiated the investigation. *Id.* Thus, we reasoned, had the district court applied *Fowler*'s standard to the evidence, the defendant's trial on the witness tampering charge "would have ended in an acquittal instead of a conviction." *Id.* Similarly here, the government did not present any evidence indicating that Gatlin knew federal officers were investigating him nor any knowledge regarding the federal nature of the offenses when he sought E.H. to recant her statement. *Cf. United States v. Sutton*, 30 F.4th 981, 989–90 (10th Cir. 2022) (vacating a § 1512 conviction where the government did not present any evidence that the witness tampering conduct at issue "suggest[ing] the possibility of proceedings that were likely to be federal").

The government, however, argues that the evidence established that "the false testimony was not only likely to be, but was, conveyed to federal law enforcement." In support of its argument, the government notes that the FBI actually received her recanted testimony during its investigation. We note that the Ninth Circuit rejected a nearly identical "actual communication" argument in *Johnson*. *See* 874 F.3d at 1081–82. In that case, the government argued that *Fowler* was inapplicable because it involved a "hypothetical communication" as opposed to an "actual communication" that made its way to the federal officers in that case. *See id.* at 1081. The Ninth Circuit, in rejecting the government's argument, found the position to be "a limitation that swallows the rule," as "every federally prosecuted case must necessarily involve an actual communication to federal officers at some point." *Id.* at 1082. Thus, the court reasoned, an actual communication rendering *Fowler* inapposite would make *Fowler* "a nullity." *Id.* We agree with the Ninth Circuit's reasoning in *Johnson*. Indeed, if we were to conclude that an actual communication to a federal officer *alone* satisfied the federal nexus requirement of § 1512(b), the reasonable likelihood standard in *Fowler* would be sapped of meaning. *See Johnson*, 874 F.3d at 1081–82. Therefore, the fact that the FBI actually received E.H.'s statements does not establish that it was reasonably likely that the communication would reach a federal officer under *Fowler*.

The government also points to evidence showing the FBI began investigating Gatlin for sex trafficking of E.H. the same night she was recovered. It is true that the Supreme Court explained in

*Fowler* that the statute can reach conduct that "takes place before the victim has engaged in any communication at all with law enforcement officers—at a time when the precise communication and nature of the officer who may receive it are not yet known." *See* 563 U.S. at 673.  But in establishing the reasonable likelihood standard, the Court explained that, "[o]ften, when a defendant acts in ways that violate state criminal law, some or all of those acts will violate federal criminal law as well." *Id.* at 676.  Therefore, "where a federal crime is at issue, communication with federal law enforcement officers is almost always a *possibility*." *Id.* (emphasis in original).  Thus, the Court explained, to allow the government "to show only a mere possibility that a communication would have been with federal officials is to permit the [g]overnment to show little more than the possible commission of a federal offense." *Id.*

First, we note that sex trafficking of a minor is an offense under both federal and Florida law.  *See* Fla. Stat. § 787.06(3) (stating that any person who knowingly engages, or attempts to engage in, human trafficking commits a felony of the first degree); *Matos v. State*, 359 So. 3d 794, 797 (Fla. Dist. Ct. App. 2023) (explaining that section 787.06(3) "include[s] prostitution of a child within the definition of human trafficking").  Thus, Gatlin's conduct here violated both state and federal criminal law, meaning that prosecution for his conduct was not exclusively federal.  As the Court explained in *Fowler*, "where a federal crime is at issue, communication with federal law enforcement officers is almost always a *possibility*."  563 U.S. at 673.  But the government must show more than a mere possibility, and the government's evidence showing the opening of a

federal investigation into Gatlin's sex trafficking of E.H.—without more—does not show that the communication to a federal officer was more than remote or simply hypothetical. *See id.* at 673, 678. For example, the government did not present evidence showing that, at the time of E.H.'s recantation statements, Gatlin knew federal officers were investigating him nor had any knowledge regarding the federal nature of the offenses for which he was charged. Rather, the evidence shows that Gatlin was arrested by state law enforcement, that he thought he was going to be charged with battery under state law and that he intended E.H. to lie to the state public defender's office to influence and mislead the state prosecution. And while the FBI did begin investigating Gatlin on the night E.H. was recovered, the government presented limited evidence at trial regarding the specific interactions of state and federal officials—either on sex trafficking cases generally or on this case specifically.[5]

---

[5] It is true that the government presented testimony from one local law enforcement officer investigating the case who stated that he was on a joint sex-trafficking task force that included FBI agents and that the task forcer officers "always reach out to the FBI" to see if the FBI wanted to get involved in the case. And an FBI agent involved in the case generally stated that it was common for him to work with state law enforcement in human trafficking investigations. But under the specific facts of this case, relying on this limited evidence regarding the specific interactions of state and federal officials on sex trafficking offenses generally and this specific case alone to sustain Gatlin's § 1512(b) conviction in our view would veer too close to the possibility standard that the Supreme Court in *Fowler* disavowed. *See* 563 U.S. at 676–77.

We therefore conclude that the government's evidence established nothing more than a "remote" or "simply hypothetical" possibility that E.H.'s recantation statements would have reached a federal officer. Accordingly, no rational trier of fact could have found the federal nexus element of the witness tampering crime, and we reverse Gatlin's conviction on this count.

## B. The Court's Direction to the Jury to Continue Deliberating After Returning an Inconsistent Verdict Was Proper.

We turn now to Gatlin's second argument: that the district court violated his rights by directing the jury to continue deliberating after they reached an inconsistent verdict. To review, the jury initially returned a verdict finding Gatlin guilty of sex trafficking a minor but, on the special interrogatory, failed to find either of the conditions that could support such a verdict. Rather than resolve this inconsistency on its own one way or the other, the district court clarified the instructions for the jury and directed them to continue deliberating. Defense counsel raised a general objection to this approach, stating that "[s]ince [the jury] found no as to both prongs of the statute, we'd ask that the Court direct a verdict of not guilty as to . . . Count 1."

On appeal, Gatlin argues that, by not entering a judgment of acquittal as to Count 1 and instead ordering the jury to continue its deliberations, the district court violated the Supreme Court's holding with regard to inconsistent verdicts in *United States v. Powell*, 469 U.S. 57 (1984), as well as his Fifth and Sixth Amendment

rights, including those to a fair trial and against double jeopardy. We begin with the *Powell* argument.

### 1. *The District Court Did Not Run Afoul of* Powell.

Gatlin argues that the district court ran afoul of the Supreme Court's precedent on inconsistent verdicts under *Powell*, 469 U.S. 57. In *Powell*, the Supreme Court held that where a verdict is inconsistent as between counts of an indictment, a guilty verdict on one of the inconsistent counts may nevertheless be properly entered. *See id.* at 69 ("[T]here is no reason to vacate respondent's conviction merely because the verdicts cannot rationally be reconciled."). *Powell* stands generally for the proposition that inconsistency between verdicts on different counts does not form an independent basis for review. *See id.* at 66 ("The fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable.").

There are several rationales for this rule. A conflicting finding by the jury on two counts can equally reflect a "mistake, compromise, or lenity." *Id.* at 65. Moreover, where such a verdict reflects "jury lenity," our review would impinge on "the jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch." *Id.* And a defendant is already protected against "jury irrationality or error by the independent review of the sufficiency of the evidence." *United States v. Mitchell*, 146 F.3d 1338, 1344 (11th Cir. 1998) (quoting *Powell*, 469 U.S. at 67).

But the inconsistent verdict referred to in *Powell* is distinct from the one at issue here. In *Powell*, the issue was whether a jury could "have acquitted [the defendant] of conspiracy to possess cocaine and possession of cocaine, and still found her guilty of using the telephone to facilitate those offenses." *Powell*, 469 U.S. at 69. In other words, *Powell* referred to a verdict that was inconsistent *between counts*. Here, we have a verdict that is inconsistent *as to just one count*.

The dilemma we face here is nearly identical to the one addressed by then-Judge Gorsuch sitting on the Tenth Circuit in *United States v. Shippley*, 690 F.3d 1192 (10th Cir. 2012). In *Shippley*, the defendant was charged with conspiracy relating to a scheme to traffic "considerable amounts of high quality cocaine." *Id*. at 1193. The jury was issued two documents to fill out: a general verdict form and a set of special interrogatories asking which drug kinds and quantities were involved. *Id*. At the conclusion of the trial, "the jury returned with a guilty verdict on the general verdict form, [but] it answered 'no' to each of the special interrogatories, indicating that Mr. Shippley conspired to distribute none of the drugs at issue in the case." *Id*. The district court was "[p]erplexed," "sought advice from counsel," and then, after reinstructing the jury, asked them to "deliberate again." *Id*. "[F]urther deliberations quickly yielded an unambiguous guilty verdict." *Id*. The defendant appealed, asserting that the district court's direction to the jury to keep deliberating violated *Powell*. *Id*. at 1194.

The Tenth Circuit ultimately rejected the defendant's *Powell* argument.  Initially, then-Judge Gorsuch distinguished *Powell* on its face, saying that "nothing in *Powell* . . . speaks to the propriety of ordering further deliberations in the face of inconsistent verdicts against the same defendant on the same count"; rather, it "simply hold[s] the district court was *allowed* to enter a guilty verdict on one count despite a logically inconsistent verdict on another."  *Id.* at 1194–95 (emphasis in original).  Then-Judge Gorsuch stated:

> Even accepting for argument's sake Mr. Shippley's premise that *Powell* . . . implicitly require[s] (rather than permit[s], as [it] hold[s]) a district court to accept a verdict logically inconsistent as between counts or defendants, that still does not speak to our case.  In our case, it wasn't just logically incongruous to enter the jury's verdict, it was metaphysically impossible.  *Powell* . . . involved logical inconsistencies *between counts* . . . .  However illogical, the verdicts . . . could be given full effect.  This case, by contrast, involves an inconsistency on the *same count with the same defendant*—an inconsistency that simply could not have been given full effect.  Something had to give in our case that didn't have to give in [*Powell*].  To enter an acquittal, the district court would have needed to disregard the fact that the jury expressly found Mr. Shippley guilty.  To enter a guilty verdict, the court would have needed to overlook the special verdict findings that Mr. Shippley did not conspire to distribute any of the drugs at issue in the case.  And nothing in *Powell* . . . speaks either explicitly or implicitly about what a court's to do in these circumstances, let alone

> suggests the district court committed an error of con-
> stitutional magnitude (or otherwise) in proceeding as
> it did in this case.

*Id.* at 1195 (emphasis in original).

We are persuaded by then-Judge Gorsuch's reasoning in *Shippley* that directing the jury to continue deliberations under these circumstances was not error. Here, the district court had not accepted the jury's verdict and, as a result, the verdict was not final. *See, e.g.*, *Harrison v. Gillepsie*, 640 F.3d 888, 899 (9th Cir. 2011) ("The court may . . . reject the jury's verdict if it is inconsistent or ambiguous."). Gatlin asked the district court to enter a judgment of acquittal because the jury did not answer affirmatively either of the special interrogatories that would allow a guilty verdict. But doing so would have required the district court to overlook the jury's unanimous finding of guilt as to Count 1 on the general verdict form. And the inverse—simply accepting the general finding of guilt—was equally untenable. Here, as in *Shippley*, "it was metaphysically impossible" to give effect to the jury's verdict. *Id.*

Because the district court did not accept the jury verdict, we hold that the district court did not err by giving clarifying instructions to the jury and then directing them to continue deliberating.[6]

---

[6] In reaching this holding, we note that we are not faced with a situation where the district court *accepted* an internally inconsistent verdict, e.g., a jury's verdict that generally found a defendant guilty of a charge but also specifically found that the government had not proved an element (or elements) of the offense beyond a reasonable doubt. As such, we neither need to decide this issue nor consider whether to follow cases from our sister circuits holding that

*2.  The District Court's Decision Was Not Plainly Erroneous Under the Fifth and Sixth Amendments.*

Having determined that the district court's decision did not run afoul of *Powell*, we now address whether the decision violated Gatlin's rights under the Due Process and Double Jeopardy Clauses of the Fifth Amendment, and his right to a fair trial under the Sixth Amendment, by instructing the jury to continue deliberations after it returned the unanimous, but inconsistent, verdict of "guilty." Gatlin asserts that "the jury returned a general verdict of guilt but unanimously found . . . that [Gatlin] did not commit an essential element of the offense," and that, as such, the district court should have entered a verdict of not guilty as to Count 1.  Gatlin argues that the district court's failure to do so violated the Fifth and Sixth Amendments.  Gatlin also argues that the district court's directions to the jury were "coercive" because the district court told the jury that the verdict was "inconsistent," also told the jury that the court "had no opinion or view as to the correct verdict," and instructed the jury three times what had to be done to find Gatlin guilty, but only twice as to what had to be done to find Gatlin not guilty.

Generally, we review constitutional errors *de novo*.  *See Brown*, 364 F.3d at 1268.  But Gatlin did not raise any constitutional challenges below as to this issue.  Accordingly, the district court did

when such an internally inconsistent verdict is accepted (and jeopardy attaches) the defendant is entitled to a judgment of acquittal.  *See, e.g., United States v. Pierce*, 940 F.3d 817 (2d Cir. 2019); *United States v. Randolph*, 794 F.3d 602 (6th Cir. 2015).

not have the opportunity to consider the issue, and we are now considering it for the first time on appeal.  "[W]here, as here, a party raises a constitutional challenge for the first time on appeal, our review is limited to 'plain error.'"  *United States v. Hughes*, 840 F.3d 1368, 1385 (11th Cir. 2016) (quoting *United States v. Peters*, 403 F.3d 1263, 1270 (11th Cir. 2005)).

    Gatlin's constitutional argument is essentially a double jeopardy challenge under the Fifth Amendment, which provides that no person may "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  The "state of jeopardy attaches when a jury is empaneled and sworn, or, in a bench trial, when the judge begins to receive evidence."  *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569 (1977).  The state of jeopardy terminates once "proceedings against an accused have . . . run their full course," such as after a final verdict in the accused's favor. *Justs. of Bos. Mun. Ct. v. Lydon*, 466 U.S. 294, 308 (1984) (quoting *Price v. Georgia*, 398 U.S. 323, 326 (1970)); *accord Delgado v. Fla. Dep't of Corr.*, 659 F.3d 1311, 1324 (11th Cir. 2011) ("[T]he protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy." (quoting *Richardson v. United States*, 468 U.S. 317, 325 (1984))).  A final verdict is valid only if "it is published in open court with no juror dissent," *United States v. Acevedo*, 141 F.3d 1421, 1424 n.6 (11th Cir. 1998) (citing parenthetically *United States v. Taylor*, 507 F.2d 166, 168 (5th Cir. 1975)), and the verdict is accepted by the court, *see Taylor*, 507 F.2d at 168 & n.2, *abrogated on other grounds by United States v. Huntress*, 956 F.2d 1309, 1319 (5th Cir. 1992).

We find no plain error relating to double jeopardy because the verdict was not final. The district court stated that it had not "accepted the verdict." Defense counsel at trial acknowledged as much, stating that "[t]he jury returned an inconsistent verdict as to Count 1" and that the "verdict was not accepted by the Court due to the inconsistencies in Count 1." Since the inconsistent verdict was never final, Gatlin's initial jeopardy never terminated, and he therefore was not subjected to double jeopardy. *See Blueford v. Arkansas*, 566 U.S. 599, 608 (2012) (explaining that "finality" of the jury's verdict is "necessary to amount to an acquittal" for the purposes of terminating jeopardy).

Neither do we find that the district court plainly erred by giving a coercive instruction to the jury. To assess whether an instruction to the jury "was coercive, we consider the language of the charge and the totality of the circumstances under which it was delivered." *United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008) (discussing whether an *Allen* charge was coercive). A charge to the jury to continue deliberating is impermissibly coercive if it "appears to give a jury no choice but to return a verdict." *United States v. Jones*, 504 F.3d 1218, 1219 (11th Cir. 2007) (citing *Jenkins v. United States*, 380 U.S. 445, 446 (1965)).

Here, the district court instructed the jury as follows:

It has been brought to my attention that Count 1 is inconsistent. If you come back guilty as to Count 1, you have to find either that (a) or (b) occurred, unanimously. If you find that (a) and (b) did not occur, then the verdict would be not guilty. So what I'm

> going to ask you to do is to continue deliberations, understanding to come back with a guilty verdict, you have to find unanimously either: (a) that Mr. Gatlin used means of force, threats of force, or coercion to commit the crime?  Or (b) that Mr. Gatlin acted in reckless disregard of the fact that the minor victim was under the age of 18 years or had a reasonable opportunity to observe the minor victim.  If your answers are still no to both of those, then the verdict is not guilty.  You can't return a verdict of guilty unless you unanimously find and answer yes to either (a) or (b).  And with that, I'll ask the clerk to give you back the verdict form and ask you to continue your deliberations.

Far from forcing the jury to reach a result, the district court asked them to continue deliberating.  Moreover, the instructions fairly and impartially conveyed the jury's path to either a guilty or not guilty verdict.  We thus conclude that these instructions were not impermissibly coercive.

In sum, our review of the record reveals no plain constitutional errors.[7]

---

[7] Gatlin also asserts that he was deprived of his right to a fair trial by cumulative error.  *See United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014) ("Under the cumulative-error doctrine, we will reverse a conviction where an aggregation of non-reversible errors yields a denial of the constitutional right to a fair trial.").  Since we find no error, we likewise find no cumulative error.

### C. Gatlin Was Properly Sentenced.

We now turn to Gatlin's sentence-related arguments. Gatlin makes three arguments challenging his sentence: (1) that the custody, care, or supervisory control enhancement was improper; (2) that the repeat offender enhancement was improper; and (3) that his sentence was unreasonable. These arguments are not persuasive.

### 1.  The Custody, Care, or Supervisory Control Enhancement Was Proper.

Under U.S.S.G. § 2G1.3(b)(1)(B), a defendant's offense level may be enhanced by two if "the minor was . . . in the custody, care, or supervisory control of the defendant." According to § 2G1.3's commentary, "[s]ubsection (b)(1) is intended to have broad application and includes offenses involving a victim less than 18 years of age entrusted to the defendant, whether temporarily or permanently." U.S.S.G. § 2G1.3 cmt. n.2(A). In applying the enhancement, "the court should look to the *actual relationship* that existed between the defendant and the minor and not simply to the legal status of the defendant-minor relationship." *Id.* (emphasis added). And the commentary states that "teachers, day care providers, baby-sitters, or other temporary caretakers are among those who would be subject to this enhancement." *Id.*

In analyzing a nearly-identical section in the Guidelines— U.S.S.G. § 2G2.1—we have explained that a court's consideration of "the 'actual relationship' instead of just the 'legal status' between the defendant and the victim . . . requires a functional

approach instead of a formalistic one." *United States v. Isaac*, 987 F.3d 980, 991 (11th Cir. 2021) (quoting U.S.S.G. § 2G2.1 cmt. n.5(A)). Additionally, in *Isaac*, this Court looked to the plain meaning of the operative phrase in § 2G2.1(b)(5)—"custody, care, or supervisory control," which is identical to the language in § 2G1.3(b)(1)(B). *See id.* at 991. This Court explained that "the plain meaning of stating that a child is in a person's care is simply to say the person is responsible for looking after the child's wellbeing." *Id.* at 992.

Gatlin argues that the § 2G1.3(b)(1)(B) enhancement was incorrectly applied to him because he and E.H. did not have any preexisting relationship. In doing so, he cites *United States v. Brooks*, 610 F.3d 1186 (9th Cir. 2010), for the proposition that a defendant's role must be similar to that of a parent, relative, or legal guardian, and argues that he was not in a position of "parent-like authority."

In *Brooks*, the Ninth Circuit concluded that § 2G1.3(b)(1)(B) "refers to a defendant's role with respect to the minor that is comparable to that of the parents, relatives, and legal guardians covered by" § 2G1.3(b)(1)(A) based on the term "otherwise" in § 2G1.3(b)(1)(B). *Id.* at 1200–01. The Ninth Circuit also noted that the Sentencing Commission's commentary that listed "teachers, day care providers, baby-sitters, or other temporary caretakers" as examples to whom the enhancement may apply and found that "[t]eachers, day care providers, and baby-sitters all act *in loco parentis*, in a position of authority over the minor that exists apart from the conduct giving rise to the offense." *Id.* at 1201. The court, however, did recognize that the commentary did "not expressly

limit application of the enhancement to defendants with similar authority" and instructed courts to "look to the actual relationship that existed between the defendant and the minor and not simply to the legal status of the defendant-minor relationship" in applying the enhancement, which has "broad application." *Id.* (quoting § 2G1.3 cmt. n.2(A)).

However, in *Isaac*, we interpreted a sentencing enhancement (§ 2G2.1) with the same language as § 2G1.3(b)(1)(B). *See* 987 F.3d at 991–92. We explained that the language of the commentary was "broadly inclusive," as it used terminology—i.e., "*includes* offenses involving a minor entrusted to the defendant" and "*among* those who would be subject to this enhancement"—that was not exhaustive. *See id.* at 991. Additionally, relying on the plain meaning of the term "care," we concluded that "the plain meaning of stating that a child is in a person's care is simply to say the person is responsible for looking after the child's wellbeing." *See id.* at 991–92. We also recognized that the commentary required courts to consider the "actual relationship" between the victim and defendant, not just the "legal status," and that there was no requirement of a long-term relationship between the two. *See id.* at 991.

Given our decision in *Isaac*, we conclude that the Ninth Circuit's analysis in *Brooks* regarding § 2G1.3(b)(1)(B) is too narrow and thus decline to follow its approach. Like the enhancement at issue in *Isaac*, we conclude that the operative phrase in § 2G1.3(b)(1)(B)—"custody, care, or supervisory control"—is plain, i.e., "the plain meaning of stating that a child is in a person's care is

simply to say the person is responsible for looking after the child's wellbeing." 987 F.3d at 992. Further, the commentary to § 2G1.3(b)(1)(B) provides for "broad application" of the enhancement and tells us to "look to the actual relationship that existed between the defendant and the minor." § 2G1.3 cmt. n.2(A). We thus decline to adopt the more "formalistic" view held by the Ninth Circuit, *see Isaac*, 987 F.3d at 991 (determining that the actual relationship between the defendant and the victim "requires a functional approach instead of a formalistic one"), that the application of § 2G1.3(b)(1)(B) is limited to relationships between the defendant and the victim that are only "broadly comparable to that of parents, relatives, and legal guardians," *see Brooks*, 610 F.3d at 1201. Indeed, we note that the Fourth Circuit has concluded that a district court did not plainly err in applying § 2G1.3(b)(1)(B) to a case with similar facts. *Cf. United States v. Muslim*, 944 F.3d 154, 169 (4th Cir. 2019) (finding no plain error in application of § 2G1.3(b)(1)(B) where (1) the minor victim moved in the defendant when she was under eighteen years old, (2) the minor victim relied on the defendant to drive her to school, and (3) the defendant provided for the victims of his prostitution ring, including the minor victim).

Turning to the facts of this case, our review of the district court's factual findings in applying a sentencing enhancement is for clear error. *See Trujillo*, 146 F.3d at 847; *Muslim*, 944 F.3d at 167. We conclude that the district court did not clearly err in its factual findings. Indeed, the evidence shows that Gatlin did occupy a guardian-like position over E.H. Gatlin was forty-one years old when he met seventeen-year-old E.H., who promptly told him her

age. Gatlin knew that E.H. was unemployed, a drug addict, and homeless after being kicked out by her grandmother. He provided E.H. with shelter and food during the relevant period. Gatlin claimed that he was trying to "change her" for the better. And on at least one occasion, Gatlin introduced himself as E.H.'s father. While Gatlin and E.H. only had a short-term relationship, § 2G1.3(b)(1)(B) does not require the defendant and the victim to have a long-term relationship. § 2G1.3 cmt. n.2(A); *see Isaac*, 987 F.3d at 991–92 ("Under the plain meaning of being in someone's 'care,' D.J. was 'in the care of' Isaac . . . . He had been providing D.J. and her family with the necessities of life when he picked her up in his car on the first day he molested her . . . . While D.J. was alone with him, Isaac was the adult responsible for looking after her wellbeing.").

We thus conclude that the district court did not err in applying the § 2G1.3(b)(1)(B) enhancement.

### 2. *The Repeat-Offender Enhancement Was Proper.*

U.S.S.G. § 4B1.5(b) imposes a five-level increase to a defendant's offense level if he is convicted of "a covered sex crime" and "engaged in a pattern of activity involving prohibited sexual conduct" with a minor. The commentary explains that a "pattern of activity" means that the defendant engaged in the prohibited sexual conduct on "at least two separate occasions." U.S.S.G. § 4B1.5 cmt. n.4(B)(i). And "prohibited sexual conduct" includes violations of 18 U.S.C. § 1591. *See id.* § 4B1.5 cmt. n.4(A) (explaining that sexual conduct includes "any offense described in 18 U.S.C.

§ 2426(b)(1)(A)"); § 2426(b)(1)(A) (stating that a "prior sex offense conviction" is a conviction under § 1591).

On appeal, Gatlin's only argument against the application of this enhancement is that he engaged in non-commercial sex with E.H., which is not prohibited by § 1591. As such, he contends that the district court improperly applied § 4B1.5(b).

We disagree. The record demonstrates that Gatlin violated § 1591 *repeatedly*, e.g., when Gatlin first met E.H., he paid her for sex; Gatlin transported E.H. to facilitate prostitution on numerous occasions; he rented motel rooms for E.H. to facilitate prostitution; and he coached her on pricing and sexual techniques. Based on the record evidence, we conclude that the district court did not err in applying U.S.S.G. § 4B1.5(b) here.

### D. Gatlin's Life Sentence Was Reasonable.

We evaluate the reasonableness of a sentence using a two-step process. First, we consider "whether the district court committed any significant procedural error." *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010). Second, we consider "whether the sentence is substantively reasonable under the totality of the circumstances." *Id.* As we stated in *Tome*, 611 F.3d at 1378, our review is informed by the 18 U.S.C. § 3553(a) factors, which are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range . . . ;

(5) any pertinent policy statement . . . ;

(6) the need to avoid unwarranted sentence disparities . . . ; and

(7) the need to provide restitution to any victims of the offense.

We "presume that a sentence imposed within a properly calculated United States Sentencing Guidelines range is a reasonable sentence," *Rita v. United States*, 551 U.S. 338, 341 (2007), and we review the reasonableness of a sentence only for an abuse of discretion, *Gall*, 552 U.S. at 41. "[W]hen a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation." *Rita*, 551 U.S. at 356.

Gatlin argues both that the district court committed significant procedural errors and that his sentence is substantively unreasonable. First, he argues that the district court did not address his mental health mitigation argument that, if he received proper mental health treatment, "a sentence of life would be unreasonable." Second, he asserts that the district court did not address his central sentencing argument that the "use of [a] computer" sentencing enhancements are unfair "given the pervasiveness of cellular communications."

We conclude that Gatlin's arguments are without merit. First, the district court did not commit any procedural error as to Gatlin's mental health mitigation argument. Indeed, the district court explicitly considered Gatlin's mental health issues, stating that it understood and "considered his history with his being schizophrenic and other types of bipolar issues." Second, the lack of discussion on the fairness of computer sentencing enhancements does not make the sentence substantively unreasonable. The district court considered the PSI's recommendation, Gatlin's criminal history, his mental health issues, his likelihood to reoffend and the need to protect the public, and his prior violations of probation. Gatlin may disagree with how the district court weighed the factors, but the district court did not abuse its discretion in weighing them. *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1259 (11th Cir. 2015) ("The court exercised its authority to assign heavier weight to several other sentencing factors than it assigned to the guidelines range. Nothing requires a sentencing court to give the advisory guidelines range as much weight as it gives any other

§ 3553(a) factor or combination of factors."). This district court provided adequate reasons for its decision.

Accordingly, we conclude that the district court did not abuse its discretion in sentencing Gatlin.

### E. The Order of Restitution Does Not Violate Gatlin's Sixth Amendment Rights.

Finally, we turn to Gatlin's arguments regarding the order of restitution. Pursuant to 18 U.S.C. § 3663A(a)(1), the district court was required to order "that the defendant make restitution to the victim" in this case. The government bears the burden of proof to demonstrate "the proper amount [and] type of restitution . . . by the preponderance of the evidence." *Id.* § 3664(e). In doing so, it may rely on any "evidence bearing 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Singletary*, 649 F.3d 1212, 1217 n.21 (11th Cir. 2011) (quoting *United States v. Bernardine*, 73 F.3d 1078, 1080–81 (11th Cir. 1996)). This includes the evidence adduced at trial. *See United States v. Hairston*, 888 F.2d 1349, 1353 (11th Cir. 1989) ("[T]he record provides an adequate basis upon which to review the district court's restitution order."). Where there are "difficulties in determining exactly how much" restitution is required, a district court does not abuse its discretion by "accepting a reasonable estimate." *United States v. Futrell*, 209 F.3d 1286, 1291–92 (11th Cir. 2000).

Following a restitution hearing where it heard from both the government and the defense, including from Gatlin himself, the district court ordered Gatlin to pay $1,700 in restitution. The

district court ordered that amount based on the evidence that E.H. was employed by Gatlin and turned money over to him, and that Gatlin took E.H.'s personal items with him when he left her at the convenience store bathroom.

On appeal, Gatlin raises three arguments regarding the restitution order.[8] First, he asserts that a restitution order must be put to a jury under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). According to Gatlin, in *Southern Union Co. v. United States*, 567 U.S. 343 (2012), the Supreme Court held that "*Apprendi* applies to the imposition of criminal fines." *Id.* at 360. However, we explicitly rejected this argument in *Dohrmann v. United States*, 442 F.3d 1279, 1281 (11th Cir. 2006), where we held that *Apprendi* does not apply to restitution orders because the restitution statute, 18 U.S.C. § 3663, does not have a prescribed statutory maximum. To the extent that Gatlin contends that *Dohrmann* was abrogated by *Southern Union*, we disagree. As the Seventh Circuit has explained, "*Southern Union* and the scope of *Apprendi* only come into consideration if we first conclude restitution is a criminal penalty. We decline to reach such a conclusion." *United States v. Wolfe*, 701 F.3d 1206, 1217 (7th Cir. 2012). Moreover, *Southern Union* does not discuss restitution, let alone hold that *Apprendi* should apply to it. Therefore, because the

---

[8] Gatlin does not argue that the district court erred in awarding restitution for E.H.'s lost prostitution profits because they are proceeds from illegal activity, *see generally United States v. Taylor*, 62 F.4th 146 (4th Cir. 2023), and we therefore do not address the issue.

restitution order of $1,700 concerns a restitution and not a criminal fine, Gatlin's first argument is unavailing.

Second, Gatlin asserts that the district court's delay in holding the restitution hearing deprived the court of its ability to order restitution. *See* 18 U.S.C. § 3664(d)(5) ("If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, . . . the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing."). Here, too, binding precedent demands the opposite conclusion. As the Supreme Court has explained, "a sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution" if it "made clear prior to the deadline's expiration that it would." *Dolan v. United States*, 560 U.S. 605, 608 (2010); *accord United States v. Rodriguez*, 751 F.3d 1244, 1260 (11th Cir. 2014). And the district court here did so at the sentencing hearing, stating that "restitution is mandatory and shall be ordered."

Lastly, Gatlin argues that there was insufficient evidence to support the restitution award. He raises essentially two issues with the evidence. First, he contends that some of the evidence used to estimate the total was unsworn. Second, he asserts that the estimate was not specific enough.

We reject both of Gatlin's arguments. First, evidence used to estimate a restitution total need not be sworn; it merely must "bear[] 'sufficient indicia of reliability to support its probable accuracy.'" *Singletary*, 649 F.3d at 1217 n.21 (quoting *Bernardine*, 73 F.3d at 1080–81); *see also Hairston*, 888 F.2d at 1353 ("The fact that the

[evidence] is hearsay . . . does not bar the trial judge from considering it in forming the order of restitution."). Second, the district court does not abuse its discretion when it accepts "a reasonable estimate" of the amount of restitution, and "the restitution amount may be approximated." *Futrell*, 209 F.3d at 1291–92. And here, the record shows that Gatlin was E.H.'s pimp. Because Gatlin and E.H. met in mid-October and separated on November 30, we can infer that she worked for him for about five weeks. The testimony presented at trial established that during that time, E.H. charged "[$]40 for head, [$]60 for 15 minutes, [$]80 for 30 minutes, and [$]100 for a[n] hour" in Miami, and "[$]150 for 15 minutes, [$]200 for 30 minutes, and [$]300 for a[n] hour" in the Florida Keys. The district court was entitled to rely on this evidence in calculating the restitution amount——again, an amount that may be approximated, *see id.*—and we conclude that the amount the district court ultimately calculated, $1,700, was supported by the record. We thus conclude that the district court did not err in its calculation of the restitution amount and did not violate Gatlin's rights.

## IV.    CONCLUSION

For the reasons stated, we affirm Gatlin's convictions and sentences as to Counts 1 and 2. We also affirm the district court's restitution order. But we vacate his sentence and conviction as to Count 3.

**AFFIRMED IN PART and REVERSED IN PART.**

19-14969  [JORDAN, J., Concurring in Part, Dissenting in Part]    1

JORDAN, Circuit Judge, concurring in part and dissenting in part.

I join Judge Lagoa's opinion for the court with the exception of Part III.A.2, as to which I respectfully dissent.

★ ★ ★ ★ ★

As to Part III.B, which I join, I emphasize that due to the district court's non-acceptance of the inconsistent jury verdict on Count 1 we are not faced with a situation where a final jury verdict contains answers to special interrogatories that preclude a general finding of guilt. Had the district court accepted the jury's inconsistent verdict, I do not think Mr. Gatlin's conviction on Count 1 could stand. *See, e.g.*, *United States v. Pierce*, 940 F.3d 817, 821–23 (2d Cir. 2019) ("[T]he appropriate remedy for the inconsistency [within a count in the jury verdict] (when the jury was not given the opportunity to reconsider) [i]s to set aside the guilty verdict[.]"); *United States v. Randolph*, 794 F.3d 602, 609 (6th Cir. 2015) ("Here, the jury's special verdict found that the drugs 'involved in' the conspiracy were 'none.' This unanimous finding negates an essential element of the charged drug conspiracy and is only susceptible to one interpretation: the government failed to prove Randolph guilty of the charged drug conspiracy beyond a reasonable doubt."); *United States v. Gonzalez*, 841 F.3d 339, 348 (5th Cir. 2016) ("Courts consistently vacate convictions when the answers to special interrogatories undermine a finding of guilt the jury made on the general question."); *United States v. Mitchell*, 476 F.3d 539, 544 (8th Cir. 2007) ("[D]ouble jeopardy is triggered when either . . . a jury acquits

2      [JORDAN, J., Concurring in Part, Dissenting in Part]  19-14969

a defendant or . . . makes a factual finding that would be fatal to the government's case.").

*  *  *  *  *

My disagreement concerns Part III.A.2, which upholds Mr. Gatlin's conviction for production of child pornography under 18 U.S.C. § 2251(a). Though the issue is admittedly close, I do not believe the evidence was sufficient to support a guilty verdict on this charge.

The conviction, as noted in the court's opinion, is based on a single "live" photo taken by Mr. Gatlin during intercourse with E.H. Having reviewed the single live photo, I don't think that the evidence is sufficient to convict Mr. Gatlin of production of child pornography. In my view, Mr. Gatlin correctly asserts that the evidence showed only that he took a photo during sexual intercourse with E.H., not that he had sexual intercourse with her for the purpose of producing child pornography.

The relevant language of § 2251(a) makes it a felony for "[a]ny person" to "induce[ ], entice[ ], or coerce[ ] any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct." Our precedent establishes that taking or producing explicit photos need not be the "defendant's sole or primary purpose," and it is "enough to show that it was 'a purpose' for doing so." *United States v. Miller*, 819 F.3d 1314, 1316 (11th Cir. 2016). But the statute's language specifies that "a defendant must engage in the sexual activity with the

19-14969  [JORDAN, J., Concurring in Part, Dissenting in Part]    3

specific intent to produce a visual depiction; it is not sufficient simply to prove that the defendant purposefully took a picture." *United States v. Palomino-Coronado*, 805 F.3d 127, 131 (4th Cir. 2015). I agree that there was enough evidence to establish that Mr. Gatlin took the photo, but that photo does not show that Mr. Gatlin and E.H. "posed" for the photo by "remaining still during sexual intercourse." Maj. Op. at 17–18.  Not all sexual activity, after all, is comprised of uninterrupted and continuous physical motion.

The court reasons that a jury could reasonably infer from the pause in the middle of intercourse that, for at least some fraction of the time, Mr. Gatlin was engaged in sexual conduct with E.H. partly for the purpose of recording it.  I'm not so sure, and my concern is that we are coming close to making § 2251(a) a strict liability statute.  Generally speaking, taking a photo requires the person with the camera to pause for a moment, focus on the subject, and press a button.  So, the court may be saying that if the defendant takes a photo during sexual intercourse with a minor, that act will always provide enough evidence to convict the defendant of production of child pornography under § 2251(a).

The conduct here is different (and less substantial) than the conduct at issue in *United States v. Lebowitz*, 676 F.3d 1000, 1013 (11th Cir. 2012), where the defendant and the minor victim discussed videotaping a sexual encounter prior to the recording, the defendant brought a camera and tripod through the victim's bedroom window and set up the equipment, and the sexual encounter took place in that bedroom only because there was no room for the

4       [JORDAN, J., Concurring in Part, Dissenting in Part]  19-14969

equipment in the defendant's car.  I do not maintain that the evidence in *Lebowitz* is the only evidence that will suffice for a production of child pornography conviction, but I do think that this case—with a single live photo—is markedly different.  The facts here seem much closer to those in *Palomino-Colorado*, 805 F.3d at 131–33, which reversed a § 2251(a) conviction based on a single cellphone photograph that was subsequently deleted.

As the Second Circuit has explained, under § 2251(a) the "[s]equence" of events "is critical. . . . [A defendant] c[an] only persuade, induce, or entice [a minor] to take [p]hotos . . . if his persuasion, inducement, or enticement came *before* [he] took them." *United States v. Broxmeyer*, 616 F.3d 120, 125 (2d Cir. 2010) (emphasis in original).  Here, there is no testimony from E.H. (or any other evidence) about how the photograph came to be taken, or when during the encounter it was taken. Nor is there evidence about whether she and Mr. Gatlin had discussed photographing their encounter at any point before the photo was taken, whether he gave E.H. any instructions before or during their encounter to facilitate the taking of the photo, *see United States v. Torres*, 894 F.3d 305, 314–15 (D.C. Cir. 2018), or whether he had ever recorded any of their other sexual encounters. *See also United States v. Lee*, 603 F.3d 904, 918 (11th Cir. 2010) (holding that the defendant's description of "how many photographs he wanted of each girl" and "how he wanted the girls to pose" contributed to the reasonableness of the jury's finding that he intended to use the minors for the production of child pornography); *United States v. Morales-de Jesus*, 372 F.3d 6, 21–22 (1st Cir. 2004) (evidence was sufficient where the defendant

19-14969  [JORDAN, J., Concurring in Part, Dissenting in Part]      5

"actively concealed from the minor the fact that he was videotaping her," gave her "specific instructions regarding certain positions he wanted her to assume relative to the camera," and "instructed her on what to say while the camera recorded their activities"). This is also not a case where the number or volume of sexually explicit recordings or depictions may be indicative of purpose. *See, e.g.*, *United States v. Ortiz-Graulau*, 526 F.3d 16, 18–19 (1st Cir. 2008) (evidence was sufficient where the defendant took over fifty pictures because the "number of photographs . . . permit[ted] a strong inference that some of the conduct occurred in order to make the photographs"). There was, in other words, no circumstantial evidence aside from the single photo itself from which a jury could infer that the sexual activity with E.H. was for the "purpose" (in the words of the statute) of producing child pornography.

The government's theory at closing argument seems to have been that the mere taking of the photograph established Mr. Gatlin's antecedent purpose to produce child pornography. *See* D.E. 211 at 118, 122. That theory is, in my view, legally unsound. *See, e.g.*, *United States v. McCauley*, 983 F.3d 690, 696–97 (4th Cir. 2020) ("Accordingly, § 2251(a) does not criminalize a spontaneous decision to create a visual depiction in the middle of sexual activity without some sufficient pause or other evidence to demonstrate that the production of child pornography was at least a significant purpose. Adducing 'a purpose' arising only at the moment the depiction is created erroneously allows the fact of taking an explicit video of a minor to stand in for the motivation that animated the decision to do so. It is for this reason that while the image itself can

6       [JORDAN, J., Concurring in Part, Dissenting in Part]  19-14969

be probative of intent if the prosecution makes a significant connection, it cannot be the only evidence . . . . That would impermissibly reduce the statute to a strict liability offense."); *Torres*, 894 F.3d at 321 (Williams, J., concurring in part) ("On the government's reading, any picture-snapping during an assembly of two or more persons (including at least one minor) that displays someone's pubic region . . . gives the anterior 'exhibition' the object of producing child pornography merely because of what is in the image."); *Palomino-Colorado*, 805 F.3d at 133 ("[T]he government appears to conflate the voluntary act of taking the picture with the specific intent required under the statute."). *Cf. United States v. Crandon*, 173 F.3d 122, 129 (3d Cir. 1999) (addressing U.S.S.G. § 2G2.2(c)(1), which contains the phrase "for the purpose of producing a visual depiction of such conduct": "It simply is not enough to say 'the photo speaks for itself *and* for the defendant, and that is the end of the matter,' as the government's position would dictate, when the [guideline] makes specific reference to the defendant's purpose in taking the photograph.") (emphasis in original).

★ ★ ★ ★ ★

I would vacate Mr. Gatlin's § 2251(a) conviction and sentence due to insufficient evidence.

19-14969 [LUCK, J., Concurring in Part, Dissenting in Part]    1

LUCK, Circuit Judge, concurring in part and dissenting in part:

I join all of the majority opinion save for the one section— III.A.*3*.—vacating Jason Gatlin's conviction for witness tampering under 18 U.S.C. section 1512(b)(3). And even as to that one section, there's a lot in the majority opinion I agree with.

For example, I agree that, to convict Gatlin of witness tampering under section 1512(b)(3), the government had to prove that he (1) knowingly used intimidation, threatened, or corruptly persuaded E.H., or engaged in misleading conduct towards E.H., with the intent to (2) hinder, delay, or prevent the communication of information related to the commission or possible commission of a federal offense (3) to a law enforcement officer or judge of the United States. I agree that, to prove intent, *Fowler v. United States* required the government to show two things: first, that Gatlin intended to hinder, delay, or prevent E.H. from communicating with law enforcement in general; and, second, that there was a reasonable likelihood E.H.'s communication would have been made to a federal officer. *See* 563 U.S. 668, 670 (2011).

And I agree the government offered sufficient evidence supporting *Fowler*'s first prong. Before he was arrested, Gatlin gave E.H. money and food—telling her it was so she would recant and lie to law enforcement about being trafficked. Then after he was arrested, Gatlin told E.H.—while she was living in his mother's house and had "nowhere" else to go—to change her statement in a sworn affidavit and "tell em" not to call her anymore, that she was not coming to court, and that she was leaving town and "not

2        [LUCK, J., Concurring in Part, Dissenting in Part]  19-14969

coming back."  Gatlin also told his mother to pay E.H. a thousand dollars to recant her statements.  Gatlin's mother then drove E.H. to Gatlin's attorney's office to change her statement and Gatlin's mother paid E.H. as E.H. was leaving town.

Where I part ways with the majority opinion is on *Fowler*'s second prong—whether it was reasonably likely for E.H.'s communication to be made to a federal officer.  While conceding it's a "close call," the majority opinion concludes the government's evidence was insufficient because it "did not present any evidence indicating that Gatlin knew federal officers were investigating him nor any knowledge regarding the federal nature of the offense when he sought E.H. to recant her statement."  And, reinforcing the point, the majority opinion repeats that "the government did not present evidence showing that, at the time of E.H.'s recantation statements, Gatlin knew federal officers were investigating him nor had any knowledge regarding the federal nature of the offense for which he was charged."  I disagree with the majority's conclusion for two reasons.

First, to the extent the majority opinion can be read as requiring the government to prove Gatlin knew federal officers were investigating him or the federal nature of the offense, this misses the mark.  *Fowler*'s second intent prong requires only a reasonable likelihood that a relevant communication would have been made to a federal officer.  *See id.*  Knowledge about the federal investigation and the federal nature of the offense may be strong evidence that it was reasonably likely for a communication to be made to a

19-14969 [Luck, J., Concurring in Part, Dissenting in Part]        3

federal officer. But that knowledge isn't a necessary element of the witness-tampering statute. *Cf. id.* at 677–78 (explaining that "an intent to prevent communication with law enforcement officers generally . . . includes an intent to prevent communications with *federal* law enforcement officers" if the reasonable likelihood standard is satisfied).

Second, applying the proper standard, the government's evidence was sufficient to show a reasonable likelihood that E.H.'s communications would have been made to federal officers. Federal Bureau of Investigation Special Agent Alex Loff, who works human trafficking cases in the Miami-Dade area "full-time," testified that the FBI was involved in E.H.'s case as early as "early December"—days after E.H. called the police for help from the gas station. It was "[i]ncredibly common," Special Agent Loff said, for the FBI to work with state law enforcement officers on human trafficking investigations and it was "routine" for the FBI to respond when a victim is recovered by state officers. And after he confirmed learning about E.H.'s recantation, Special Agent Loff explained that, although it might occur in piecemeal fashion, it was typical for federal investigators to receive all the information from a state-related investigation.

Miami-Dade Police Department Detective Kurtis Lueck, the local law enforcement officer assigned to E.H.'s case, also testified he was part of a sex-trafficking task force that included Special Agent Loff's office. Detective Lueck explained that, after a sex-trafficking investigation is opened, the local task force officers "always

4          [LUCK, J., Concurring in Part, Dissenting in Part]  19-14969

reach out to the FBI to see if they want to go out with us and get involved in the case."

Given the evidence that the FBI joined the investigation days after E.H.'s call from the gas station, it was incredibly common for the FBI to be involved in trafficking investigations in the Miami-Dade area, the area's local officers were in a joint trafficking task force with federal officers, and the local officers always reached out to the FBI about trafficking cases and typically shared their information, it was more than a remote, outlandish, or hypothetical possibility that E.H.'s communications would have been made to federal officers. *Cf. United States v. Ramos-Cruz*, 667 F.3d 487, 498–99 (4th Cir. 2012) ("When, as occurred here, federal law enforcement authorities become involved in an investigation approximately a month after the relevant murder, federal authorities are specifically focusing on the group in question, and local authorities investigating the underlying crime are actively cooperating with federal law enforcement officers, the reasonable likelihood standard is met."). Federal officers were part of this case from the get-go.

The majority opinion compares this case to *United States v. Chafin*, 808 F.3d 1263 (11th Cir. 2015). There, "the government introduced *no evidence* showing that [the defendant]'s statements to the [state agent] investigating the alleged misuse of the jail commissary account were reasonably likely to be communicated to federal authorities." *Id*. at 1274 (emphasis added). The only evidence, we said, pointed in the "opposite" direction:  the state agent "told

19-14969 [LUCK, J., Concurring in Part, Dissenting in Part]          5

[the defendant] that the local district attorney had initiated the investigation." *Id.*

But here, unlike *Chafin*, the government presented evidence showing that E.H.'s statements were reasonably likely to be communicated to federal authorities. Unlike *Chafin*, E.H.'s case was investigated from the start not only by local and state officers, but by the FBI. Unlike *Chafin*, the local officers were part of the federal task force investigating sex-trafficking crimes. And unlike *Chafin*, the evidence showed that the local officers always reached out to the FBI about sex-trafficking investigations, and it was incredibly common for the FBI and local officers to work together on cases like E.H.'s. The stark difference in evidence between this case and *Chafin* shows why the evidence was insufficient there but sufficient here.

Because I believe sufficient evidence showed a reasonable likelihood of E.H.'s communications being made to federal officers, I respectfully dissent from the one section of the majority opinion vacating Gatlin's witness-tampering conviction.